The People of the State of New York ex rel. New York Electric Lines Company, Appellant, *v.* William B. Ellison, as Commissioner of Water Supply, Gas and Electricity of the City of New York, et al., Respondents.

Municipal Corporations — New York Electric Lines Company Not Entitled to Build Independent Subways in City of New York.
The principal, fundamental and essential purpose of the incorporation of the New York Electric Lines Company is to construct, use and maintain lines of wire for conducting electricity. The conduits in which the wires are to be laid are mere incidents to such purpose. The acts of 1885 and 1887 (L. 1885, ch. 489; L. 1887, ch. 716), relating to the placing of electrical conductors under ground in cities of this state, are proper police regulations which the legislature had the power to enact and impair no contract right of the New York Electric Lines Company, although such company, by chapter 483 of the Laws of 1881, was entitled to lay electric conductors under ground in the streets of cities upon securing permission from the common council of the city, and had secured such permission; having failed to take advantage thereof before the passage of such acts, it must comply with their provisions and with the plans adopted thereunder for the purpose of placing electrical conductors under ground. It was the duty of the commissioner of water supply, gas and electricity, therefore, to deny an application of said company for permission to open the streets of the city to construct an independent line of subways or conduits for the purpose of laying electric conductors therein.
*People ex rel. N. Y. El. Lines Co.* v. *Ellison,* 115 App. Div. 254, affirmed.

(Argued February 21, 1907; decided May 28, 1907.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, entered

November 10, 1906, which affirmed an order of Special Term denying a motion for a peremptory writ of mandamus.

The nature of the proceeding and the facts, so far as material, are stated in the opinion.

*David B. Hill, J. Aspinwall Hodge* and *Frank B. Vermilya* for appellant.    The franchise granted to the relator by the state is a contract and was made complete by the ordinance of 1883 and its acceptance by the relator, and it is protected by the Federal Constitution against impairment, either by the legislature or the municipal authorities.    (*Davis* v. *Mayor, etc.*, 14 N. Y. 506; *Milhau* v. *Sharp*, 27 N. Y. 611; *People* v. *Sturtevant*, 9 N. Y. 263; *Mayor, etc.*, v. *S. A. R. R. Co.*, 32 N. Y. 261; *Mayor, etc.*, v. *T. A. R. R. Co.*, 33 N. Y. 42; *City of Rochester* v. *R. Ry. Co.*, 182 N. Y. 99; *Presbyterian Church* v. *New York*, 5 Cow. 538; *Village of Carthage* v. *Frederick*, 122 N. Y. 268; *Wright* v. *Nagle*, 101 U. S. 791; *New Jersey* v. *Yard*, 95 U. S. 104.) It was not the intention of the legislature by the subway acts to so modify the relator's franchise and contract as to deprive it of the substantial property right of constructing its own subways.    (*W. U. T. Co.* v. *Mayor, etc.*, 38 Fed. Rep. 552; *E. S. Co.* v. *B. & S. A. R. R. Co.*, 87 Hun, 279; *Turner* v. *Sawyer*, 150 U. S. 585.)    If it is held that any provision of the subway acts deprives the relator of its right to construct its own subways, then such portion of the act is an impairment of the relator's contract with the state and city and void.    (*S. W. W. Co.* v. *Vil. of Skaneateles*, 161 N. Y. 154; *Lake View* v. *R. H. C. Co.*, 70 Ill. 191; *Henderson* v. *Mayor, etc.*, 92 U. S. 259; *Chy Lung* v. *Freeman*, 92 U. S. 275; *Smith* v. *S. L., etc., R. R. Co.*, 181 U. S. 248; *Fletcher* v. *Peck*, 6 Cranch, 87; *N. O. G. L. Co.* v. *L. L. Co.*, 115 U. S. 650; *Broughton* v. *Pensacola*, 93 U. S. 266; *Red Rock* v. *Henry*, 106 U. S. 596; *Mount Pleasant* v. *Beckwith*, 100 U. S. 514.)    In any view of the relator's rights in this proceeding, it is entitled to a writ commanding the respondent to issue a permit, and, in his discretion, to regulate the manner of the exercise of the relator's

1907.] People ex rel. N. Y. El. Lines Co. v. Ellison. 525

N. Y. Rep.]                    Points of counsel.

rights under its franchise. (*Howland* v. *Eldredge*, 43 N. Y. 457, 461 ; *People ex rel. Francis* v. *Troy*, 78 N. Y. 33.)

*W. B. Burnet* for intervenors. The contention that the franchise was modified by the state, in the exercise of the police power, and the relator's individual right to open the streets for the laying of electrical conduits of its own has passed, its franchise having been so modified by competent legislation that it cannot assert an individual right to operate its own subway system, is untenable. (*Trustees, etc.,* v. *Jessup*, 162 N. Y. 122; *People ex rel. C. S. Co.* v. *Monroe*, 85 App. Div. 542; *The Binghamton Bridge*, 3 Wall. 51; *W. R. B. Co.* v. *Dix*, 6 How. [U. S.] 507; *People* v. *B. R. R. Co.*, 126 N. Y. 29; *Walla Walla* v. *W. W. Water Co.*, 172 U. S. 1; *N. O. G. Co.* v. *L. L. Co.*, 115 U. S. 650; *N. O. W. W. Co.* v. *Rivers*, 115 U. S. 674; *St. T. W. Works* v. *N. O. W. Works*, 120 U. S. 640; *C. C. G. L. Co.* v. *N. O. G. L. Co.*, 27 La. Ann. 138–147.)

*William B. Ellison Corporation Counsel (Theodore Connoly, William P. Burr, William J. Clark* and *Leonce Fuller* of counsel), for respondent. The subway acts (L. 1884, ch. 534; L. 1885, ch. 449) modified the franchise granted by the state to the company, and on its failure to comply with such new requirements the company lost its right to proceed thereunder. (*People ex rel. N. Y. E. L. Co.* v. *Squire*, 107 N. Y. 598; 145 U. S. 190; *M. E. L. Co.* v. *Grant*, 31 N. Y. S. R. 254; *E. C. S. Co.* v. *B. & S. A. R. R. Co.*, 87 Hun, 279.) By the failure of relator to obtain from the board of electrical control approval of its plans, the only right left to the company, under the act of 1885, was to place its wires in the subways constructed under the direction of the board. (*People ex rel. N. Y. E. L. Co.* v. *Squire*, 107 N. Y. 598; *New York* v. *Squire*, 145 U. S. 190.) The city having revoked its former grant, the company has no existing right to the use of the streets, and the granting of the permit by the commissioner would be in effect the granting of a new permission, franchise or license, and so *ultra vires*. (*Wilcox* v. *McClellan*, 185 N. Y. 9.)

CHASE, J.   Although many of the facts appearing in the record and necessary to be considered in the determination of this appeal have been frequently stated in the published opinions of the courts in actions or proceedings in which the relator has been a party, it is necessary to restate some of them in expressing my views at this time.

The relator insists that it is entitled as a matter of right to a permit from the commissioner of water supply, gas and electricity of the city of New York, to construct subways or conduits beneath the surface of certain streets in said city and also to have the approval of the borough presidents of the respective boroughs to its opening said streets for the purpose of such construction work.

In 1886 the board of commissioners of electrical subways, of which board the commissioner of water supply, gas and electricity is a successor in authority, devised and made ready for use a general plan for conduits in the city of New York to meet the requirements of the subway act of 1884 (Laws of 1884, chapter 534) and 1885 (Laws of 1885, chapter 499) and by said last act the commissioners were given full authority to compel all companies operating electric wires to use the subway so prepared in accordance with the provisions of said act of 1885.   The plan so devised was carried out by a contract with the Consolidated Telegraph and Electrical Subway Company hereinafter further mentioned, which contract was expressly ratified and confirmed by the legislature of this state (Laws of 1887, chapter 716, section 6), and has been upheld by this court (*Am. Rapid Telegraph Co.* v. *Hess*, 125 N. Y. 641); and pursuant to the authority of chapter 231 of the Laws of 1891 and the consent of said Consolidated Telegraph and Electrical Subway Company further contracts for carrying out said general plan were made with said Consolidated Telegraph and Electrical Subway Company and with the Empire City Subway Company which provide for a division of the work of constructing, maintaining and operating said subways.

The relator has wholly failed to obtain the approval of the

board of commissioners of electrical subways and its successors in authority to its plan of construction as provided by section 3 of said act of 1885. Apart, however, from questions relating to the technical right of the relator to the writ demanded is the important question of the merits of the relator's claim to proceed as a matter of right to open and excavate in the streets of the city and construct a complete duplicate system of electrical subways therein. In the consideration of that question we will assume without deciding that the relator's corporate powers have not ceased, and that whatever rights the relator obtained by the permit of April 10, 1883, hereinafter referred to, so far as the same is necessary for the purpose of carrying out the principal, fundamental and essential purposes of the relator's incorporation, were and are irrevocable. What are the principal, fundamental and essential purposes of the relator's incorporation? This question must be answered by reference to its articles of incorporation and the acts of the legislature under which they were executed.

Prior to the construction of conduits under the surface of the streets and public places of the city of New York in which to place wires for conducting electricity for power, heat, light, and for telegraphic and telephonic and other similar purposes they were placed on poles or attached to brackets upon buildings and otherwise throughout the city. The line of telegraph wires was the necessary and essential part of the telegraph plant, while the poles and brackets were simply the means by which the wires were held in place.

In the General Telegraph Act of 1848 (Laws of 1848, chapter 265) no reference is made to placing wires under the ground. It provides for the incorporation of companies "For the purpose of constructing a line of wires of telegraph through this state." The act expressly provides that "Such association is authorized to construct lines of telegraph along and upon any of the public roads and highways, or across any of the waters within the limits of this state, by the erection of the necessary fixtures, including posts, piers or abutments, for sustaining the cords or wires of such lines; provided the same

shall not be so constructed as to incommode the public use of said roads or highways, or injuriously interrupt the navigation of said waters." (Section 5.)

In 1853, by chapter 471 of the Laws of that year, the act of 1848 was so amended as to provide that such association is authorized "To erect and construct, from time to time, the necessary fixtures for such lines of telegraph, upon, over or *under* any of the public roads, streets, and highways."

By chapter 483 of the Laws of 1881 it was further provided: "Any company or companies organized and incorporated under the laws of this state for the purpose of owning, constructing, using and maintaining a line or lines of electric telegraph within this state or partly within and partly beyond the limits of this state, are hereby authorized, from time to time, to construct and lay lines of electrical conductors under ground in any city, village or town within the limits of this state, subject to all the provisions of law in reference to such companies not inconsistent with this act; provided that such company shall, before laying any such line in any city, village or town of this state, first obtain from the common council of cities, the trustees of villages, or the commissioners of highways of towns, permission to use the streets within such city, village or town for the purposes herein set forth."

The number of wires in cities increased to such an extent that they became a public and private nuisance, and seriously interfered with the conduct of business, and in the operation of the fire and other departments of the city, and there was a very general public demand that the wires be removed from the streets and placed under the surface of the ground.

Several new companies were organized for the purpose of constructing a line of wires of telegraph as provided by said acts, and on the 14th day of October, 1882, the relator was incorporated under said chapter 265 of the Laws of 1848, which is entitled "An act to provide for the incorporation and regulation of telegraph companies," and also of the acts amendatory thereof and supplementary thereto, "For the purpose of owning, constructing, using, maintaining and leasing

lines of telegraph wires or other electric conductors for telegraphic or telephonic communication and for electric illumination to be placed under the pavements of the streets, avenues and public highways of the cities of New York and Brooklyn * * * and for the purpose of owning franchises for laying and operating said lines of electric conductors." And the articles of incorporation expressly declare that they are made "in pursuance to the objects declared" by said act of 1848 and the acts amendatory thereof and supplementary thereto.

It should be constantly borne in mind that the objects declared by the acts of 1848 and the acts amendatory thereof and supplementary thereto do not in terms include authority to construct conduits in which to place the wires or other electric conductors. The construction of conduits is only authorized by the acts as an incident to the construction of lines of electric conductors under the ground. It will also be observed that the general language of the relator's articles of incorporation relating to the purpose of the incorporation conforms to said statutes except that such articles include the word "leasing," which word is not found in the statutes then existing, except as it appears in the amendment of 1862 (Laws of 1862, chap. 425). After its incorporation the relator applied to the board of aldermen for permission to use the streets of the city and on April 10th, 1883, a resolution was passed by said board granting permission to it " To lay wires or other conductors of electricity in and through the streets, avenues, and highways of New York city and to make connections of such wires or conductors underground by means of the necessary vaults, test boxes, and distributing conduits, and thence above ground with points of electric illumination or of telegraphic or telephonic signal in accordance with the provisions of an ordinance to regulate the laying of subterranean telegraph wires and electric conductors in the streets of the city passed by the common council and approved by the mayor December 14, 1878."

The resolution and the ordinance therein mentioned further provide in greater detail for the protection of the interests of

530    People ex rel. N. Y. El. Lines Co. *v.* Ellison.    [May,

Opinion of the Court, per Chase, J.          [Vol. 188.

the city, and the resolution also provides for payment to the city of compensation based on the number of feet of trench to be excavated and otherwise. The relator addressed a letter April 16, 1883, to the common council of the city accepting said permission and it therein agreed to and did assume and obligate itself to observe the requirements, provisions, restrictions, conditions and limitations contained therein.

The permission granted to the relator by the board of aldermen was a step in addition to the authority obtained by it through its incorporation. It was a step necessary to enable it to lay its wires and electric conductors under the surface of the streets. The authority obtained by the relator by its incorporation was dependent upon but not enlarged by the permission.

Whatever the incorporators may have had in mind when the articles of incorporation were signed, a reading of the acts upon which the incorporation is based and the articles of incorporation shows conclusively that the principal, fundamental and essential purpose of its incorporation, and of the permission granted to the relator by the board of aldermen, was to construct, use and maintain lines of wire for conducting electricity, and that the conduits in which the wires were to be laid were and are mere incidents to such prime purpose.

The construction and maintenance of the conduits bear the same incidental relation to the real purpose of a telegraph corporation that the erection and maintenance of the poles bore to such real purpose when the wires were strung upon poles instead of being placed under the ground.

Before considering further the incidental character of the construction and maintenance of subways in which to place wires as electric conductors, a reference will be made to the acts of the legislature and the contracts executed in conformity therewith relating to electric subways in the city of New York.

The importance of a general system of subways or conduits under the surface of the streets of the city to include all electric conductors was such as to require action on the part of

the city to establish such general system. The space necessarily occupied under the surface of the streets of a great city for sewer, water, gas, steam and other pipes, subways for electric conductors and openings for transportation and many other purposes for which space is required makes it necessary to consolidate, combine and group the spaces used as much as possible.

Acts properly looking to that end are necessary in the public interest, not only on account of preserving and economizing the space under the surface of the streets, but also to avoid any unnecessary interference with the surface of the streets and thus incommode the public in the general or ordinary use of the streets themselves. If the surface of the streets is to be constantly opened to allow corporations and persons authorized to use electric conductors to construct their own conduits independent of a general plan or system it would become almost as intolerable as the maintenance of innumerable wires strung above the surface of the ground. The desirability and importance of one system of conduits for all electric conductors is manifest and conceded. By the subway act of 1884 it was provided that all telegraphic, telephonic and electric light wires and cables used in any incorporated city having a population of 500,000 or over should thereafter be placed under the surface of the streets of said city, and it was further provided that such wires and cables, including what is known as telegraph poles then in the streets of such cities, should be removed from the surface of the streets on or before the 1st day of November, 1885, and in case any company should fail to comply with the provisions of the act the local governments of said cities should without delay remove them therefrom.

The subway act of 1885 must be read in connection with said act of 1884. It provides for the appointment of a board of commissioners of electrical subways, which board was thereby charged with the responsibility of enforcing the subway act of 1884. It is further expressly provided by said act of 1885 :

532   People ex rel. N. Y. El. Lines Co. *v.* Ellison.   [May,

Opinion of the Court, per Chase, J.      [Vol. 188.

Section 4: " It shall be the duty of said board of commissioners to carefully investigate any and all methods proposed by any such company (any company operating or intending to operate electrical conductors in said city) for electric lighting or electric communication by the use of conductors * * * provided no suitable plan is proposed or in use, within sixty days after the passage of this act, it shall be the duty of such board to cause to be devised and made ready for use such a general plan as will meet the requirements of said act and of this act, and the board shall have full authority to compel all companies operating electric wires to use such subway so prepared in accordance with the provisions of this act."

No suitable plan was proposed or in use within sixty days from the passage of said act, and the board of commissioners of electric subways thereafter devised and made ready for use a general plan to meet the requirements of the acts.   Proposals for building conduits in accordance with the plans and specifications adopted by the commission were received from the relator and other companies.  · They were referred to the engineer and counsel to the commission, each of whom reported thereon to the commissioners, and on July 16, 1886, the commission accepted the proposal of the Consolidated Telegraph and Electrical Subway Company.   An agreement was entered into by the commissioners with said Consolidated Telegraph and Electrical Subway Company, dated July 27th, 1886, and it was with some amendments and modifications re-executed April 7, 1887.   By chapter 716 of the Laws of 1887 the agreement as so amended and modified was expressly ratified and confirmed.

Pursuant to chapter 231 of the Laws of 1891 a further contract with the Consolidated Telegraph and Electrical Subway Company was made May 15, 1891, which relates to conduits having high tension wires and contemporaneously therewith a further agreement with the Empire City Subway Company which relates to conduits for low tension wires.   All of the contracts mentioned were executed in behalf of the city

of New York pursuant to the authority of said acts. The contract with said Consolidated Telegraph and Electrical Subway Company as amended and the contract with the said Empire City Subway Company each provides that nothing therein contained shall be construed as granting any exclusive privilege, immunity or franchise. The contracts do not give said companies the exclusive right to maintain said subways and conduits for electric conductors (*Empire City Subway Co.* v. *B. & S. A. R. R. Co.*, 87 Hun, 279 ; affd., 159 N. Y. 555), but the commissioners by said contracts are required in good faith to carry out the terms of said contracts on their part, and by the agreement with said Empire City Subway Company it is provided : " Said parties of the first part (Board of Electrical Control, successor of Board of Commissioners of Electrical Subways) hereby agree to use all lawful means within their power to compel all authorized persons or companies using telegraph and telephone conductors * * * to place their conductors in said subways, conduits and ducts and to pay a fair rental for the space occupied therein."

Said contract also provides : " The spaces in said subways, conduits and ducts shall be leased by the party of the second part (Empire City Subway Company) to any company or corporation having lawful power to operate telegraph or telephone conductors in any street, avenue, or highway in the city of New York * * * if it or they shall apply for the same." It also provides : " The party of the second part may fix a fair scale of rents to be charged according to the kind of conductors and the amount of space required therefor which shall be at the same rate to all the occupants having a like use of said conduits and ducts, but the scale of rentals or any charges fixed or made by the party of the second part shall at all times be subject to the control, modification and revision of the parties of the first part."

It also provides : " All companies occupying space in said subways, conduits and ducts shall own their own conductors and shall have the full management and control thereof." The constitutionality of the subway acts and the reasonable-

534 People ex rel. N. Y. El. Lines Co. *v.* Ellison. [May,

Opinion of the Court, per Chase, J.            [Vol. 188.

ness of said contracts were denied and have frequently been disputed in the courts.

The American Rapid Telegraph Company resisted the efforts of the commissioners of electrical subways to compel it to remove its wires and poles from the streets and place its electric conductors in the subways of the Consolidated Telegraph and Electrical Subway Company. In or prior to 1890 said American Rapid Telegraph Company brought an action against the commissioners to restrain them and the mayor and other city officers from cutting, pulling down, removing or otherwise injuring any of the lines of telegraph poles and wires owned by it in the streets of said city. It failed to sustain its action. An appeal was taken from the judgment entered against it after the trial of that action and on such appeal the judgment of the Special Term was sustained (*American Rapid Telegraph Co.* v. *Hess*, 35 N. Y. S. R. 606) and an appeal was then taken to this court where the judgment was again sustained (125 N. Y. 641). In that case this court fully sustained the proposition that the legislature cannot divest itself of its power of control over streets for public purposes. In the opinion in that case, referring to said contracts, the court says: "We have carefully scrutinized the contract entered into by the board of electrical control with the defendants, the Consolidated Telegraph and Electrical Subway Company, and we find nothing in its provisions unreasonable or impractical and the power of the legislature to authorize such a contract and to confirm it when made, is beyond doubt. These acts of 1884, 1885 and 1887 have been under consideration in several cases and have uniformly been upheld and enforced. (*People ex rel. N. Y. Elec. Lines Co.* v. *Squire*, 107 N. Y. 593 ; 1 N. Y. S. R. 633 ; *U. S. Ill. Co.* v. *Hess*, 19 id. 883 ; *U. S. Ill. Co.* v. *Grant*, 27 id. 767 ; *Western Union Tel. Co.* v. *Mayor, etc.*, 38 Fed. Rep. 552, opinion by Wallace, J., in the U. S. Circuit Court.)"

The American Rapid Telegraph Company by the acts under which it was incorporated was authorized by express terms to construct lines of telegraph along the public roads and high-

ways, and to erect necessary fixtures, including posts, piers or abutments for sustaining the cords or wires of such lines.

This court refrained from saying that said telegraph company did not by the acts under which it was incorporated obtain some sort of franchise in the streets of the city. The plaintiff claimed that it had a franchise to use the streets for its poles and wires, and that, therefore, an inviolable contract was created which is under the protection of the Federal Constitution and that the city could not remove the poles or wires from the streets except upon compensation to it ascertained in the manner prescribed by the Constitution in cases where private property is condemned for public use. This court held that the property was not taken for public use, but that after the passage of the act referred to and the building of the subways and the notice to the plaintiff it had no right longer to maintain its poles and wires above the surface of the streets. The acts of the legislature and contracts, so far as they modify the property rights of the telegraph company, were a proper exercise of the police power, notwithstanding that they resulted in substantial expense to said company.

Soon after the first contract was made with the Consolidated Telegraph and Electrical Subway Company, the relator made application to the commissioner of public works for leave to make excavations in the streets of the city to construct its line of electric conductors. The commissioner refused to grant the permit, and the relator then applied to the Court of Common Pleas for a writ of mandamus to compel the granting of such permit. The application for the writ was refused (*People ex rel. New York Electric Lines Company* v. *Squire*, 1 N. Y. S. R. 633), and an appeal was taken therefrom to the General Term of the Court of Common Pleas (6 N. Y. S. R. 281), and from that court to this court (107 N. Y. 593), and from this court to the United States Supreme Court (145 U. S. 175), in all of which courts the order of the Court of Common Pleas was affirmed.

Allen, J., in the Court of Common Pleas, says: "It is my opinion that chapter 499 of the Laws of 1885 applies to the

relator * * * the legislature intended that the subway commissioners should have jurisdiction over the laying of all electric wires and cables and of all companies using or intending to use underground wires through the streets, and authorized them to require conformity to plans approved by them * * * I do not think that chapter 499 of the Laws of 1885 takes away or materially alters or impairs the rights which the relator possessed by way of franchise prior to the passage of said act. This act does not take away the relator's franchise, but simply regulates its use."

Ruger, Ch. J., in this court, referring to the subway act, said: "They do not purport to deny them any privileges theretofore granted, but they did require that they should be exercised with due regard to the claims of others and in such way that they should cease to constitute a public nuisance, and should be enjoyed in such a manner as to inconvenience and endanger the general public as little as possible. That regulations of the character provided for in these acts are strictly police regulations and such as no chartered rights can nullify or override is too clear to admit of dispute."

Lamar, J., in the United States Supreme Court, said: "In no sense of the term do we think it can be safely averred that the acts of 1885 and 1886 are not applicable to the relator. * * * Neither can it be said that the acts of 1885 and 1886 have a retroactive effect at least so far as the relator is concerned, since whatever rights it obtained under the ordinance of 1883 which it accepted as the basis of the contract it claims to have entered into were expressly subject to regulation in their use by the highest legislative power in the state acting for the benefit of all interests affected by those rights and for the benefit of the public generally so long as the relator's essential rights were not impaired or invaded. * * * In none of those acts is there any unqualified right conferred upon any electrical company to construct its lines wherever or in whatever manner it might choose. On the contrary, in every one of those acts provision is made for the security of the rights of the public in the use of the streets

and highways which may be used by the electric companies. * * * Independently, however, of the contractual relations of the relator, the statutes of 1885 and 1886 are so clearly an exercise of the general police powers of the state that we do not deem it necessary to add anything on that point to what was said by the Court of Appeals of New York."

The essential purpose of the relator's incorporation and of the permission acquired by it April 10, 1883, was to lay electric conductors, and its rights in that respect have not been materially or essentially violated or impaired.

The only effect of the statutes and contracts made in pursuance thereof is to require that the electric conductors to be laid by the relator shall be placed in conduits constructed in accordance with the general plan prepared in accordance with said statutes, instead of allowing the relator to construct its own subways for laying such electric conductors.

The rights of the relator have not in my judgment been impaired by said acts and contracts in any essential particular.

As there is nothing in the record before us to show that the conduits constructed pursuant to said contracts are not sufficient and adequate for all purposes required under said contract, including space for laying any wires desired by the relator; and as it does not appear but that all the parties to said contracts are carrying out the terms thereof in good faith, and that the relator, if authorized to use telegraph and telephone conductors in said city may, upon request and on payment of a reasonable rental therefor, use said conduits for carrying out all the purposes for which the relator is incorporated, and the essential purposes for which the said permission was granted, it was in my judgment the duty of the commissioner of water supply, gas and electricity, apart from any other considerations, to deny the relator's application, and the order appealed from should be affirmed, with costs.

HAIGHT, J.  I concur in the result reached by CHASE, J. The relator was incorporated in 1882 "for the purpose of owning, constructing, using, maintaining and leasing lines of

538 People ex rel. N. Y. El. Lines Co. *v.* Ellison. [May,

Opinion per Haight, J. [Vol. 188.

telegraph wires or other electric conductors for telegraphic or telephonic communication, and for electric illumination, to be placed under the pavements of the streets, avenues and public highways of the city of New York." In April, 1883, the board of aldermen passed a resolution permitting it to lay its wires or other conductors of electricity through the streets of the city under ground, upon the condition that the work should be performed under the control and supervision of the commissioner of public works.

In 1885, before the relator had undertaken the laying of its conductors under ground, the legislature, by chapter 499, created a board of electrical subways, to whom was given the control of all electrical wires and cables to be used in the streets of the city, empowering the board to devise and adopt a plan by which electric wires and conductors could be placed under ground, and authorizing their use when and where needed for the convenience of the public. Thereupon a plan was devised and adopted by the commissioners which, in substance, called for the construction of conduits under the streets of the city through which electric wires and conductors could be run and used by those entitled, upon the payment of a reasonable rental, and a contract was entered into with another corporation to construct such conduits, and upon the completion thereof, all companies intending to operate electrical conductors, were required to place them through such conduits and remove their wires from the streets. Subsequently, by chapter 716 of the Laws of 1887, such contract was ratified and confirmed, and thereafter it was made unlawful for any corporation or individual to take up the pavement of the streets of the city, or to excavate therein for the purpose of laying under ground any electrical conductors unless by a permit, in writing, of the board of commissioners of electrical subways.

In July, 1886, the relator applied to the department of public works for permission to open the streets of the city, for the purpose of laying its wires and conductors. This permission was refused, and thereupon a peremptory writ of mandamus was applied for, to compel the commissioner to

1907.] People ex rel. N. Y. El. Lines Co. *v.* Ellison. 539

N. Y. Rep.]            Opinion per Haight, J.

grant such permit. This was denied by the court. The relator has now applied to the commissioner of water supply, gas and electricity, who, by a subsequent statute, has become charged with the duties that devolved upon the commissioners of electrical subways, for such leave, and has again been refused. It now seeks by mandamus to compel the granting of such permission.

While the former proceeding may not be a bar to the proceeding now instituted, it appears to me that the reasons given for the decision made in the former case are controlling upon the questions now presented. That case was reviewed not only by this court, but by the Supreme Court of the United States, in which it was distinctly held that the provisions of the acts of 1885 and 1887, under which a plan was adopted for an electrical underground subway under the control of the commissioners, was a proper police regulation which the legislature had the power to provide, and that those acts applied to and were binding upon the relator. (*People ex rel. N. Y. Elec. Lines Co.* v. *Squire,* 1 N. Y. S. R. 363; 6 N. Y. S. R. 281; 107 N. Y. 593; 145 U. S. 175.)

It consequently follows that the relator must comply with the provisions of those statutes, and with the plans adopted for the placing of electrical conductors under ground and that the courts will not, by mandamus, interfere with the judgment and discretion of the commissioner, who, under the statute, is given the power to determine whether such a permit as is here prayed for should be granted.

The order should be affirmed, with costs.

Edward T. Bartlett and Vann, JJ., concur with Chase, J.; Haight, J., concurs in result in opinion, and Werner, J., concurs in result; Cullen, Ch. J., and Gray, J., take no part.

Order affirmed.