# Town of New Decatur *v.* American Telephone & Telegraph Co.

*Bill to Restrain the Enforcement of an Ordinance.*

(Decided February 15, 1912. Rehearing Denied May 1, 1912.
58 South. 613.)

*Constitutional Law; Ex Post Facto; Obligation of Contract; Special Privileges.*—Comparing sections 23, article 1, Constitution 1875, with section 22, Constitution 1901, in connection with the case made by the bill, it is held that the bill was not subject to the demurrer interposed, but that it contained equity and stated a cause of action.

(Dowdell, C. J., Simpson and McClellan, JJ., dissent.)

APPEAL from Morgan Law and Equity Court.

Heard before Hon. THOMAS W. WERT.

Bill by the American Telephone & Telegraph Company against the Town of New Decatur. From a decree overruling demurrers to the bill, defendant appeals. Affirmed on rehearing.

The case made by the bill is that on the 7th day of June, 1898, the board of aldermen of the town of New Decatur passed an ordinance, which is set out in the bill, which in effect grants to the American Telephone & Telegraph Company, a New York corporation, the right to construct, operate, and maintain telephone and telegraph lines, including the necessary poles, wires, and fixtures, upon, along, and under the streets of said town according to the terms of said ordinance. The ordinance empowered the street committee to direct the location and character of poles and wires to be erected, and provided that the company shall be subject at all times to all ordinances now in force, or that may be hereafter passed, relating to the use of said highways of said town. The bill further shows the construction of a telephone system, under said franchise and ordinance, which was completed on the 2d day of December, 1898, and the operation of the system since that date. The bill further shows an acquisition by the complainant company, an Alabama corporation, of the rights of the Southern Bell Telephone & Telegraph Company in said town, together with its franchise and property. It also shows the acquirement by it of all the franchise rights and property of the original grantee, the American Telephone & Telegraph Company, in said town. It is further alleged that on the 14th day of March, 1904, the board of aldermen of the town adopted an ordinance repealing the ordinance of June 7, 1898, and that on the 3d day of May, 1904, such board of aldermen adopt-

ed an ordinance requiring the complainant to remove from the streets, avenues, alleys, and highways of said town all of its said poles, wires, cross-arms, property, and fixtures of every kind, and requiring the marshal and police officers of the town to remove all the poles, wire, etc., in case the company did not remove them, and declaring that, if the removal was not made by the company within a specified time, the poles and wires should be declared a nuisance. The bill then alleges the expense of orator in erecting the plant, the number of contracts it has in existence, and that the carrying out of the last-named ordinance would not only impair its contracts, but would impair and absolutely destroy its property and right to do business. It also alleges an attempt or threatened attempt to carry into effect the above-named ordinance. The prayer is for an injunction restraining the city from carrying out the last-named ordinance, and to declare the same void. The demurrers raise the questions discussed in the opinion.

TENNIS TIDWELL, E. W. GODBEY and W. A. GUNTER, for appellant. A permit that is granted without consideration is nothing more than a license.—*Hicks v. Swift Creek M. Co.*, 133 Ala. 441; 50 L. R. A. 142; 6 W. & S. 101; 140 Fed. 692; 167 U. S. 92; *Baldwin v. K. C. M. & B.*, 111 Ala. 515. If the ordinance is revocable at all, the bill is without equity, since it exhibits an unequivocal revocation by the repealing ordinance, and the effect sought to be given it by the bill would make it a perpetuity.—*B. & P. C. Ry. Co. v. Bir. St. Ry.*, 79 Ala. 473; 47 Pa. St. 314; 102 Pa. 123; 26 L. R. A. 621; 3 N. E. 277; 13 L. R. A. 455, and authorities supra. While the telephone paraphernalia is a highway use, it is hostile to every other sort of highway use.—*St. Louis v. Western Union*, 148 U. S. 94.

[Town of New Decatur v. American Telephone & Telegraph Co.]

The city has no authority to destroy forever without consideration such a large portion of the highway.— *City of Mobile v. L. & N.*, 124 Ala. 132, and authority next above. There must be an express power to grant franchises of this character.—*L. & N. v. M. J. & K. C.*, 124 Ala. 162. Nothing passes by mere implication.— *Knoxville Water Co. Case*, 200 U. S. 22; *St. Louis v. W. U. T. Co.*, supra, and authorities next above. A franchise in perpetuity is void.—*Bir., etc., Co. v. Bir., etc., Co.*, supra; 167 U. S. 88; 67 Am. Dec. 186; 84 Am. Dec. 314; 140 Fed. 695. A franchise without limit is revocable at will.—167 U. S. 88; 47 Pa. St. 314; 102 Pa. 123; 59 Fed. 327; 3 N. E. 377; 49 Ohio St. 82; 20 L. R. A. 126; 6 W. & S. 101; 13 L. R. A. 455; 50 L. R. A. 152; 34 L. R. A. 184; 146 U. S. 387; 91 N. W. 1081; 28 Cyc. 655, 875; 171 U. S. 48; 67 Tex. 542; 67 Fed. 196; 114 Fed. 688; 12 A. R. R. & C. Rep. 398; 64 L. R. A. 630; 111 Pac. 865. Section 22 was construed in 79 Ala., supra to prohibit any municipal franchise to a public utility corporation without limit, and also held that the constitutional provision refers to quite other than political rights and privileges.— *Cullman v. Arndt*, 125 Ala. 581; *Daughdrill v. Ala. L. I. Co.*, 31 Ala. 91; *Randolph v. Builders Co.*, 106 Ala. 511; *Clark v. Mobile Commissioners*, 36 Ala. 621; *Carter v. Coleman*, 84 Ala. 256; *Johnson v. State*, 88 Ala. 176; *Pace's Case*, 69 Ala. 231; 67 Ala. 26. The *Birmingham St. Ry. Case* above referred to is squarely to the point that section 22, Constitution 1901, applies to municipal ordinances, and has been widely followed.— *Fort Smith v. Hunt*, 66 L. R. A. 238; *State v. Mayor, etc.*, 8 Atl. 123. Complainant can get no consolation from section 5817, Code 1907, as highway as used therein has no application to city streets.—*McCain v. State*, 62 Ala. 138; 7 Words & Phrases, 6250, 6684, et seq;

28 L. R. A. 310; 12 South. 338; 14 South. 459; 95 N. Y. 141; 2 Dillon Mun. Crop. 677, and notes; 59 Maine 450; *Hobbs v. Long_Dis. T. & T. Co.*, 147 Ala. 393. The ordinance does not seek to vacate the grant, but is merely a regulation of the manner of its exercise.— *Art. Co. v. Hess,* 13 L. R. A. 454; *W. U. T. Co. v. New York*, 3 L. R. A. 449. Rights under such an ordinance are incapable of assignment.—*U. S. v. W. U. T. Co.,* 50 Fed. 28; 127 Fed. 195; Elliott on Railroads, sec. 71 and note; 130 U. S. 1.

CALLAHAN & HARRIS, EYSTER & EYSTER, KNOX, ACKER, DIXON & STERNE, CHARLES D. M. COLE, STEINER, CRUM & WEIL, J. T. STOKELY, and H. E. W. PALMER, for appellee. The telephone company had a contract, or an accepted franchise, which was the same as a contract.—166 U. S. 557; 147 Fed. 13; 172 U. S. 1. The general power of the municipality was sufficient to authorize it to grant the franchise, and make the contract. —*Hobbs v. Long Dist. T. & T. Co.,* 41 South. 1003; *Intendent v. Pippin,* 31 Ala. 543; *City of Greenville v. Greenville W. Wks.,* 125 Ala. 625; 49 N. E. 951; 136 Mass. 75; 89 Mo. 258; 82 N. W. 821; 3 Pac. 285; 14 L. R. A. (N. S.) 654; 46 Mo. App. 120; 54 Hun. 469; 53 Ill. App. 379. Aside from the power of the municipality to grant the franchise, the state in pursuance of its general policy by section 1244, Code 1896, gives the company the right to construct and maintain lines along the public highway, and this statute would be sufficient to authorize the grant, should it be conceded that the power of the city were inadequate.—104 Fed. 834; 162 Fed. 523; 174 Fed. 1020; *Gaston v. State,* 117 Ala. 162; 93 N. W. 596; 103 N. W. 120; 53 L. R. A. 175; 36 South. 266; 25 South. 295; 27 A. & E. Enc. of Law, 1066; 43 Atl. 784. That streets are highways, see

*Hobbs v. Long Dist. T. & T. Co.*, 41 South. 103. A contract was entered into in the exercise of the city's administrative or business power.—*Weller v. City of Gadsden,* 141 Ala. 642; *City of Gadsden v. Mitchell, et al.,* 145 Ala. 157; *City of Greenville v. Greenville Water Wks. Co., supra; City of Bessemer v. Bessemer City Water Wks.,* 152 Ala. 391, and numerous cases cited in the opinion.

SIMPSON, J.—As will be seen from the statement of this case by the reporter, the question for consideration is the right of the municipal corporation of New Decatur to repeal a former ordinance granting to the appellee corporation the right "to construct, operate, and maintain lines of telephone and telegraph, including necessary poles, wires and fixtures, upon and along the highways of the said town," etc. No time was fixed for the duration of said franchise, and the ordinance provides that "said company shall be subject to all ordinances now in force, or that may hereafter be passed, relative to the use of said highways of said town." Subsequent to the repealing ordinance, another was passed May 3, 1904, directing said company to remove its poles and wires from said streets within 30 days, and providing that thereafter the same would be considered as a nuisance, and the prayer of the bill is for a writ of injunction to prevent the enforcement of said ordinance. The original ordinance was an exercise of the governmental powers of the municipal authorities granting a franchise. In our Constitution of 1875 there was added to the section (now section 22, Const. 1901) that no ex post facto law, nor any law impairing the obligations of contracts shall be passed, this additional clause "or making any irrevocable grants of special privileges or immunities shall be passed by the General Assembly."

This, being a prohibitive law on the power of the Legislature, necessarily carries with it a like prohibition as to the lawmaking power of every municipal corporation, the creature of the Legislature. Subsequent to the adoption of said Constitution, every ordinance of a municipal corporation, in the exercise of its legislative powers, must be construed as if that section of the Constitution was written into it.—*Sioux City St. Ry. v. Sioux City*, 138 U. S. 98, 107, 11 Sup. Ct. 226, 34 L. Ed. 898; *Mayor of Mobile v. Stonewall Ins. Co.*, 53 Ala. 570, 578, 579. In the case of *Weller et al. v. City of Gadsden, et al.*, 141 Ala. 642, 37 South. 682, the justice who wrote the opinion states distinctly that the matter involved was a contract "entered into by the city, in the exercise of its administrative or business powers, rather than under its governing or purely lawmaking authority" (141 Ala. 658, 37 South. 685), and proceeds to make remarks on the effect of section 22 of our Constitution, yet the other justices distinctly place their concurrence in the result on the ground that, whether the repealing ordinance was valid or invalid, the bill was without equity, and pretermit any concurrence in the views expressed in the opinion (141 Ala. 663, 37 South. 687). In the subsequent case of *City of Gadsden et al. v. Mitchell*, in which the same ordinance came up for consideration, this court pretermitted the question stating "so that the only question is whether, with the contract still in force and unrepealed, said city can refuse to carry out its provisions."—145 Ala. 157, 40 South. 558, 6 L. R. A. (N. S.) 781, 117 Am. St. Rep. 20. This being the law, it necessarily follows that the original ordinance granting the franchise was subject to the power of the municipal authorities to repeal it.

It is next insisted that, under section 5817 of the Code of 1907 (section 2490 of Code of 1896), said telegraph and telephone company was authorized to occupy the streets of said town, regardless of any permission by the municipal authorities. Said section is a part of chapter 135, art. 1, entitled "General provisions as to public roads," and the provisions of said chapter relate to the establishing, laying out, maintaining, etc., of the public roads of the counties, and not to the streets of a municipality. Said section is as follows, to wit: "The right of way is granted to any person or corporation having the right to construct telegraph or telephone lines within this state, to construct them along the margin of public highways." The position of this section in the chapter referred to, and the fact that it is retained in the present Code, notwithstanding the Constitution of 1901, § 220, provides that "no person, firm, association or corporation shall be authorized or permitted to use the streets, avenues, alleys or public places of any city, town or village for the construction or operation of any public utility or private enterprise, without first obtaining the consent of the proper authorities of such city, town or village," are pursuasive to show that said section 5817 was not intended to include the streets of any city, town, or village. It is true that the Supreme Court of Minnesota and other courts resting upon the general definitions of the word "highway" have held that the word includes "streets" (*N. W. Tel. Ex. Co. v. Minneapolis,* 81 Minn. 140, 83 N. W. 527, 86 N. W. 69, 53 L. R. A. 175), but we cannot assent to that conclusion. We prefer the reasoning and conclusion of Start, C. J., in his dissenting opinion in that case.—81 Minn. 165, 86 N. W. 75, 53 L. R. A. 191. This conclusion is reinforced by the numerous sections of our Code showing that all legislative matters

in regard to the streets and other subjects in cities and towns are committed to the municipal authorities.

We hold, then, that said company cannot rest its rights, upon said section 5817. It results that the court erred in overruling the demurrer to the bill as amended and motion to dissolve the injunction.

The decree of the court is reversed, and a decree will be here rendered sustaining the demurrer to the bill as amended, and granting the motion to dissolve the injunction.

Reversed and rendered.

DOWDELL, C. J., and SIMPSON, McCLELLAN, SAYRE, and SOMERVILLE, JJ., concur. ANDERSON and MAYFIELD, JJ., dissent.

MAYFIELD, J.—(dissenting.)—The effect of the ordinances of the city complained of in this bill, and which this decision decrees to be valid, is to take from this complainant, the appellee here, several miles of telegraph and telephone lines, upon which for several years it has been collecting tolls as a public service corporation, and to destroy several thousand dollars' worth of its property. It is not pretended that this is done by reason for any forfeiture, or of any wrong done to or suffered by the appellant; but, if it were, surely it would require at least some kind of judicial proceedings and finding to support the confiscation of this property. It is not claimed by the city that these offending ordinances were passed as police regulations; in fact, the bill avers they were not, and the hearing was on demurrer, which, of course, admitted these averments. But there is no pretense that the ordinances are mere regulations, and they must be sustained, if at all, in the exercise of that reserved power to amend, alter,

revoke, and repeal which is reserved in sections 22 and 238 of the Constitution of this state. In fact, this court bases its decision upon section 22 of the Bill of Rights; and the town relies upon the ordinances as an exercise of that power. There are cases which on a casual reading would seem to sustain and support these ordinances, and therefore the decision of this court; but I submit, with all due deference to the opinion of my Brothers, that on a careful reading they are all distinguishable from the decision in this case. Many of them are cited in the brief of appellant, and I have examined and studied carefully many, if not all, of them. Most of these will be found to be cases where the ordinance or statute complained of was the exercise of a proper police regulation for the preservation of public rights, or they are cases in which the franchise offered or conferred by the sovereign was not accepted so as to bind it as by a contract, and, until accepted, its offer could, of course, be withdrawn. But I submit without any fear of successful contradiction that there cannot be found a well-considered case which holds that a state Legislature or a municipality, under the most extensive or complete reserved power to alter, amend, revoke, and repeal, can take from a corporation any of its substantive property or property rights. The power has been denied in some cases where the property interest or right was small and insignificant.—*Albany Northern R. Co. v. Brownell,* 24 N. Y. 345. The same doctrine has been adhered to in cases which involved millions.— *Sinking Fund Cases,* 99 U. S. 700, 25 L. Ed. 496; *The Broadway N. Y. Case,* 111 N. Y. 1-66, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684; *R. R. Cases v. Maine,* 96 U. S. 499, 4 2L. Ed. 836; *Albany R. R. Co. v. Brownell,* 24 N. Y. 345. The same law which protects the large interest protects the smallest. It is not an in-

stance in which the doctrine non minimis curat lex
should be liberally applied, because the principle thus
violated is a fundamental one that underlies all prop-
erty rights; and as Judge Cooley aptly says of it: "The
first successful inroad upon it that obtains judicial
sanction may be a precedent that shall let in innumer-
able evils. Courts must look beyond the particular
case to the governing principle, and be governed by
that, regardless of temporary and special inconven-
iences."—*Detroit v. Detroit Co.*, 43 Mich. 140-149, 5
N. W. 275, 281.

I believe that the decision of my Brothers in this case
is that "first invasion" of that sacred and fundamental
principle to which Judge Cooley referred. I think
the invasion is not intentional in this case, and that
my Brothers do not believe it exists; but I feel sure
that it does, and I am writing this dissent in the hope
that they will examine authorities cited, and reconsid-
er. I hope that what I have said in this dissent, or in
any other that I may hereafter say, will not be con-
sidered as some dissents have been considered—a harsh
or severe criticism of my Brothers, of their opinion, or
decisions. I know, of course, what everybody else
knows that they have not and would not any more than
I willfully or negligently decide any case wrongly, or
ignore or violate any provision of the Constitution, stat-
utes, or the rights of litigants. It is simply an honest
difference of opinion as to the law and the rights of the
parties involved in this case, and what is said here,
however emphatically or spiritedly, is intended only to
enforce, to give zest or point to the argument in sup-
port of my own contention, and not in disregard or rid-
icule of the opinion of my Brothers. In my judgment
the error into which my Brothers have fallen is due
largely, if not solely, to a wrong construction of sec-

tion 22 of the Constitution, of section 5817 of the Code, and of the ordinances in question. I shall treat some of these fully, and others only incidentally.

As to the reserved powers of repeal, alteration, and revocation, the court has unwittingly extended these too far, and to subjects and purposes not within the contemplation of the Constitution makers. But for section 10 of article 1 of the Constitution of the United States, as to impairing the obligation of contracts (and probably some other provisions), the power of the state to amend or revoke charters would be ample without being expressly reserved. The reservation leaves the state just as any other government would be, which is not restrained by express constitutional limitations. It can do whatever any constitutional sovereign can when not restrained; but not that which would be inconsistent with or repugnant to all constitutional or civil government principles. It will certainly not be claimed at this late day that any civil government of an English-speaking people has the right to arbitrarily take from corporations or individuals any property which they have rightfully acquired, except for governmental purposes, and then only in the mode and manner provided by law. Such an arbitrary taking of property as is alleged in this bill has never been authorized or allowed by any civil government since Magna Charta; and before that, when the power was exercised, it was recognized and could be denominated as nothing but pure tyranny.

Judge Cooley, from whom I quote almost literally, says it is wholly immaterial in what way the property was lawfully acquired, whether by labor, gift, or by profitable use of a franchise; that, if it has become private property, it is then protected by the "law of the land." The charters of municipal corporations are in

no sense contracts; yet they are protected by the Constitution as property rightfully acquired for local purposes, and the state cannot despoil them of it.—*Detroit v. Detroit Co.*, 43 Mich. 148, 5 N. W. 275. What was said by Cooley, J., in the above case is strictly applicable to this case. It should be borne in mind (and this, I fear, my Brothers have not done) that it is not a question in this case as to the right or power of the state or the municipality to regulate the amount of tolls chargeable, or to otherwise regulate appellee's business as a public service corporation, but it is as to the power and right of the municipality to deprive the appellee of the privilege of taking any tolls by destroying all of its property. If it can do this as to this property, it can do so as to all such property within its territorial jurisdiction. If it can thus arbitrarily destroy the business of appellee, it can likewise destroy that of all other public service corporations within its jurisdiction. If this city can do this, then all others cities in the state can do likewise. And if the cities can, of course the state can; and thus all the property of public service corporations acquired under and by virtue of franchises could be confiscated. I do not believe that this is now the law of this state, nor that it ever was or ever will be. I firmly believe that my Brothers will recede from their position after they have reflected upon the subject, upon the situation in which it places public service corporations, and their property acquired by virtue of franchise rights granted by the state, no matter when nor how the grant was made.

I cannot willingly assent to the doctrine which justifies a municipality in doing what this bill alleges the respondent has done, and will do unless restrained. Such a law in my opinion must of necessity ascribe to a municipality some kind of sovereign right to treat arbi-

trarily and as it pleases all public service corporations with which it deals, and to exempt itself, not only from its duties under the civil law, but also from "that great law of morality which should bind all governments and parts thereof as it binds all individuals, to do justice and keep faith." It was, no doubt, as Mr. Storey says, the fear and dread of just such a law that induced the makers of the federal Constitution to insert in section 10 of article 1 the provision that no state shall "pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts." I do not think that our Constitution makers deemed it possible, with this provision in both the state and federal Constitutions, that acts such as this bill alleges were done could be justified. What is said by Mr. Justice Field is in a dissenting opinion like this one, but it rings so true to life and to all governments, and is so applicable to both the law and facts of this case, as I see them, that I must be excused for so often and so unreservedly adopting both his ideas and language in my opinion. If the government will not keep faith, little better can be expected from the citizen. If contracts are not observed, no property will in the end be respected; and all history shows that rights of persons are unsafe where property is insecure. Protection to one goes with protection to the other; and there can be neither prosperity nor progress where this foundation of all just government is unsettled. "The moment," said the elder Adams, "the idea is admitted into society that property is not as sacred as the laws of God, and that there is not a force of law and public justice to protect it, anarchy and tyranny commence." I am aware of the opinion which prevails generally that the business corporations have by their accumulation of wealth and the numbers in their employ become so powerful as to be disturbing and dan-

gerous influences in the legislation of the country, and
that they should therefore be brought by stringent meas-
ures into subjection to the state.   This may be true.   I
do not say that it is not; but, if it is, it furnishes no
justification for the repudiation or evasion of the con-
tracts made with them by the government.  The same
law that protects the wealth of the most powerful pro-
tects the most humble; and the law which would con-
fiscate the millions of the one today would to-morrow
take the pennies of the other.

The reason why such acts as this bill alleges the re-
spondents is doing and will continue to do unless re-
strained are both void and wrong was probably never
better expressed than by Chief Justice Marshall and
Johnson, J., in the famous case of *Fletcher v. Peck*, 6
Cranch, 87, 3 L. Ed. 162.   In that case the Legislature
of Georgia had done and attempted to do what the town
of New Decatur has done and is attempting to do in
this case; that is, after having made numerous grants
by one act, they tried to destroy the grants by repeal-
ing the act which made them.   In speaking of the mat-
ter, Marshall, C. J., said:  "The principle asserted is
that one Legislature is competent to repeal any act
which a former Legislature was competent to pass, and
that one Legislature cannot abridge the powers of a suc-
ceeding Legislature.   The correctness of this principle,
so far as respects general legislation, can never be con-
troverted.   But, if an act be done under a law, a suc-
ceeding Legislature cannot undo it.   The past cannot
be recalled by the most absolute power.   Conveyances
have been made, those conveyances have vested legal
estates, and, if those estates may be seized by the sov-
ereign authority, still that they originally vested is a
fact, and cannot cease to be a fact.   When, then, a law
is in its nature a contract, when absolute rights have

vested under that contract, a repeal of the law cannot divest those rights; and the act of annullling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community. It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and, if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation? The contract between Georgia and the purchasers was executed by the grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant in its own nature amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is therefore always estopped by his own grant."—*Fletcher v. Peck,* 6 Cranch, 137, 3 L. Ed. 162. Johnson, J., says in the same case: "I do not hesitate to declare that a state does not possess the power of revoking its own grants. But I do it on a general principle, on the reason and nature of things, a principle which will impose laws even on the Deity. A contrary opinion can only be maintained upon the ground that no existing Legislature can abridge the powers of those which will succeed it. To a certain extent this is certainly correct; but the distinction lies between power and interest, the right of jurisdiction, and the right of soil. The right of jurisdiction is essentially connected to, or rather identified with, the national sovereignty. To part with it is to commit a species of political suicide. In fact, a power to produce its own annihilation is an absurdity in terms. It is a power as utterly incommunicable to a political as to a natural person. But it is not so with the interests or property of a nation. Its possessions nationally are in no wise necessary to its political existence.

They are entirely accidental, and may be parted with in every respect similarly to those of the individuals who compose the community. When subject to the individual, they have lost all control over it, have nothing to act upon. It has passed from them; is vested in the individual; becomes intimately blended with his existence, as essentially so as the blood circulates through his system. The government may indeed demand of him the one or the other, not because they are his, but because whatever is his is his country's." Says Judge Field, after stating his views of the law upon this subject: "Similar views are found expressed in the opinions of other judges of the Supreme Court of the United States. In *Calder v. Bull,* which was decided in 1798, Mr. Justice Chase said that there were acts which the federal and state Legislatures could not pass without exceeding their authority, and among them he mentioned a law which punished a citizen for an innocent act, a law that destroyed or impaired the lawful private contracts of citizens, a law which made a man judge in his own case, a law that took the property from A and gave it to B. 'It is against all reason and justice,' he added, 'for a people to intrust a Legislature with such powers, and therefore it cannot be presumed that they have done it. They may command what is right and prohibit what is wrong; but they cannot change innocence into guilt, or punish innocence as a crime, or violate the right of an antecedent lawful private contract, or the right of private property. To maintain that a federal or state Legislature possesses such powers if they had not been expressely retained would, in my opinion, be a political heresy altogether inadmissible in all free republican governments.'—3 Dall. 388 [1 L. Ed. 648]. In *Ogden v. Sanders* [12 Wheat. 213, 6 L. Ed. 606], which was decided in 1827, Mr. Justice Thompson, re-

[Town of New Decatur v. American Telephone & Telegraph Co.]

ferring to the clauses of the Constitution prohibiting the state from passing a bill of attainder, an ex post facto law, or a law impairing the obligation of contracts, said: 'Neither provision can strictly be considered as introducing any new principle, but only for a greater security and safety to incorporate into this charter provisions admitted by all to be among the first principles of our government. No state court would, I presume, sanction and enforce an ex post facto law, if no such prohibition was contained in the Constitution of the United States; so neither would retrospective laws, taking away vested rights, be enforced. Such laws are repugnant to those fundamental principles upon which every just system of laws is founded.' In the Federalist Mr. Madison declared that laws impairing the obligation of contracts were contrary to the first principles of the social compact and to every principle of sound legislation; and in the *Dartmouth College Case*[4 Wheat. 518, 4 L. Ed. 629], Mr. Webster contended that acts which were there held to impair the obligation of contracts were not the exercise of a power properly legislative, as their object and effect was to take away vested rights. 'To justify the taking away of vested rights,' he said, 'there must be a forfeiture, to adjudge upon and declare which is the proper province of the judiciary.' "

The majority opinion bases the decision chiefly upon its construction of section 22 of the Bill of Rights. It reads as follows: "That (1) no ex post facto, (2) or any other law impairing the obligation of contracts, (3) or (law) making any irrevocable grants of special privileges or immunities shall be passed by the Legislature; (4) and every grant, or franchise, privilege, or immunity, shall forever remain subject to revocation, alteration or amendment." (Paranthetical numbers

added by writer.) This is the first time one of the Bills of Rights has ever been accused of deserting the people, to fight for the sovereign. For centuries they have been the English-speaking peoples' chief defenders against the aggressions and encroachments of all monarchs, crowns, and sovereigns upon the rights of the citizens. At the formation of all our American governments, these Bills of Rights were each named, selected, and reserved by the people who formed the government as the "home guards" and "defenders," to protect their lives, liberties, and property from all illegal assaults by the government which they had created. To make doubly sure of this, they often inserted in their Constitutions provisions like section 36 of ours, which reads as follows: "That this enumeration of certain rights, shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare, that everything in this Declaration of Rights is excepted out of the general powers of government and shall forever remain inviolate." Yet the majority opinion holds that one of these trusted "home guards," who was numbered 22, is not so excepted, but is one of the government's delegated agencies or authorities for arbitrarily destroying the property of the citizen. Against this indictment of this home guard for deserting, I shall, for him, enter the plea of not guilty, and attempt to prove it.

The opinion is as wrong in its genealogy of this section of the Bill of Rights, as it is in its construction of it. The last clause of this section, which I have numbered 4, the one the opinion relies upon as conferring both the right and the power upon a municipal corporation to destroy the property of telegraph and telephone companies, was not in the Constitution of 1875, but appeared for the first time, in the Constitution of 1901.

[Town of New Decatur v. American Telephone & Telegraph Co.]

It is therefore ex post facto if it is made to apply to the ordinance or law in question, which was approved on the 7th day of June, 1898. The rights acquired and the contracts made thereunder had attached and become vested before the Constitution of 1901 was adopted. A constitutional provision can no more destroy vested rights nor impair the obligations of existing contracts than can a statute or a municipal ordinance. The construction the court places upon this section makes it inconsistent with itself, makes it contribute to and proclaim its own invalidity. If the last clause means what the court in this case holds it to mean, what becomes of the first and second clauses which say that the Legislature shall not pass any law that is ex post facto or which impairs the obligation of contracts? The "wrongs" complained of in this bill are certainly in violation of the first and second clauses of this section; yet the court holds that they are made "rights" by virtue of the third and fourth clauses of the same section.

My Brothers wholly overlook the first and second clauses, which constitute the head and body of the section, and which have always been in all our Constitutions, and in all other Bills of Rights. The third and fourth are only tails, or appendages; one being added by the Constitutional Convention of 1875, and the other by that of 1901. Like a kite, it may now need a tail to properly fly; but the whole strength and virtue of the section does not reside in the tail, so as to make it a "kangaroo clause," or a case of "the tail's wagging the dog," or so as to liken it to the fabled jointed snake which had a construction and a "little movement all its own," by which with its tail it could lop off its head and its body at will. Certainly the third and fourth clauses of this section of the Constitution ought not to be so construed as to violate the first and second, or any other

provisions of the Constitution which guarantee due process, and equal protection of the law, to the citizen.

I know that my Brothers do not think their construction complained of has the effect of violating these other provisions of the Constitution to which I refer; but I am writing this dissertation to try to show that it does have this effect. I heartily agree with the majority when they say in the opinion: "Subsequent to the adoption of said Constitution (that of 1875) every ordinance of a municipal corporation in the exercise of its legislative powers must be construed as if that section (22) of the Constitution was written into it." And, may I not add, every other section of the Constitution and every other general law of the state that is applicable. The Constitution expressly provides that municipalities shall not be authorized to pass laws inconsistent with the general laws of the state. While the court recognizes and announces this proposition, it straightway proceeds to construe the ordinances as if the last clause of section 22 of the Constitution was all the law applicable to the ordinance. As I have heretofore said, and will now point out fully, the last clause of section 22 was not in the Constitution of 1875, but appeared for the first time in the Constitution of 1901; yet the majority make it applicable to a law passed in 1898. By this construction what becomes of the first clause of section 22, that no ex post facto law shall be passed? Why not read the first and second clauses into the second and third ordinances, as well as to read the fourth clause into the first ordinance? The second and third ordinances construed by the court, if valid, destroy thousands of dollars worth of property and hundreds, if not thousands, of contracts. What becomes of the second clause of section 22, which says that the obligation of contracts shall not be impaired? What becomes of the

[Town of New Decatur v. American Telephone & Telegraph Co.]

various provisions of the Constitution and of the statutes intended to secure to the citizen "due process of law," when a municipality is allowed by its mere ipse dixit to destroy $20,000 worth of property without even a pretended trial, with or without a jury? What becomes of section 239 of the Constitution, which says: "Any association or corporation organized for the purpose, or any individual, shall have the right to construct and maintain lines of telegraph and telephone within this state, and connect the same with other lines, and the Legislature shall, by general law of uniform operation, provide reasonable regulations to give full effect to this section," when this municipality, by the third ordinance, destroys the property of a telegraph and telephone company, declares its business a nuisance, and prohibits it from carrying out its contracts with thousands of customers?

What becomes of section 5817 of the Code, which is the general law of uniform operation which the Constitution directed the Legislature to pass in order to give effect to the constitutional provisions? This section reads as follows: "The right of way is granted to any person or corporation having the right to construct telegraph and telephone lines within this state to construct them along the margin of public highways." The majority opinion attempts to answer this question by saying that "public highways" as used in that statute does not include "streets." If not, why not? Because the opinion says that that section of the Code is found in the chapter relating to "public roads," and therefore the word "highways," as used in the section must be limited so as to exclude "streets." I do not think this is a reasonable construction of the word "highways" as used in this section of the Code, for the following reasons: This statute was originally passed by the Legislature in

33—176

1855. Surely it included streets when it was passed, and so continued to include them for 12 years, when it was then, by the Code Commission, placed in the chapter of the Code relating to "public roads." The statute as originally passed, and as it has ever since remained, is a separate, distinct and independent enactment. It forms no part of, and has no relation to, the sections of the Code which precede or follow it. They no more affect it than did the acts which preceded and followed it in the original Acts of 1855, in which it was first published. So the rule of construing statutes in pari materia has no application to this section. If the rule of construction adopted by the court in this case is correct, and the Code Commissioners had placed this section in the chapter of the Code relating to municipal corporations, it would not have applied to public roads; and, if they had placed it in the chapter relating to railroads, it would not have applied to either streets or public roads. The construction placed upon the word by this court is entirely too narrow. It declines to give effect to either the Constitution or the statute.

If it does not include "streets," then it does not include "railroads." How can the statute be general and uniform if it applies to one kind of highways, and not to another? If the Legislature had intended that the statute should apply only to "public roads," would they not have said "public roads," instead of "highways," which includes both these and many other ways? Is it not a matter of common knowledge that this statute was applied to streets and to railroads for 35 years or more before it was ever applied or used as to public roads? It is only within the last 15 or 20 years that telegraph and telephone lines have been used along the public roads, yet the term has been used and applied to both streets and railroads since the law was first enacted. The stat-

utory provision really preceded the constitutional provision, but the latter directed that the law should be general and of uniform operation. The construction placed upon the statute would strike it down, because in violation of the constitutional provision.

It was decided by the federal court in the case of *Southern Bell, etc., Co. v. Mobile* (C. C.) 162 Fed. 523, construing this identical phrase and statute, that the term "highways" embraces city streets within the meaning of the statute, and that it includes urban as well as rural highways; and in that case it was further held that this statute gave telegraph and telephone companies the right to occupy the streets and alleys in cities and incorporated towns without authority from such cities and towns. While this decision is not binding on this court, it ought to be strongly persuasive when it is in accord with all the adjudged cases construing statutes of other states, identical in purpose and almost identical in verbiage. The word "highway" is a generic term. It is the genus of all kinds of public ways, including roads, streets, alleys, turnpikes, railroads, tramways, bridges, ferries, canals, and navigable rivers. Chancellor Kent defined "highway" in his Commentaries as "every thoroughfare which is used by the public, whether it be a carriageway, a horseway, a footway, or a navigable river." The term has been held to include "so much of a public square as is around a courthouse and devoted to the public." It has been held to include the sidewalks of a city. The word "street" imports a highway.—Rap. Law Dict. p. 1226. It is said by the Supreme Court of Florida that the meaning of the term "street" is not sufficiently broad to include all highways, though all streets are embraced in the generic term "highway."—*Duval v. Jacksonville*, 36 Fla. 196, 18 South. 339, 29 L. R. A. 416. Bouvier's Dictionary de-

fines a "highway" as a passage, road, or street, which every citizen has a right to use, and defines a "street" as a highway in a city or village. Nothing that is said in *McCain v. State,* 62 Ala. 138, nor in *Wiggins v. Skeggs,* 171 Ala. 492, 54 South. 756, nor *Jefferson County v. Birmingham,* 172 Ala. 138, 54 South. 757, is to the contrary. The most that can be said of these cases is that the word "road," as used in section 215 of the Constitution and in certain statutes, does not include streets of cities, which is quite a different thing from holding that the word "highways" as used in section 5817 of the Code does not include such streets.

I can see no reason why the word "highways" as used in this statute should be limited to rural highways. It is matter of common knowledge that telegraph and telephone companies have always had their offices in the business center of municipalities, and that they rarely, if ever, deliver messages from their wires at private residences on rural highways, though their poles and wires extend over or along the same. It is true that telephone lines have been recently extended along the rural highways, and into the private homes of people living in the country; but it is equally true that they go to the homes of people in the cities, and that the homes of people in city and country are now connected by such wires to the mutual comfort and advantage of the inhabitants of both.

I cannot think that it was the intention of the Legislature in enacting section 5817 of the Code to provide that telegraph and telephone lines should be constructed along rural highways, but not upon and along the streets of towns and cities. There is certainly no reason why these companies should have a right to erect their lines upon the country roads, while the people in the towns or cities should be denied the conveniences and advant-

ages to be thus afforded, or that they should be other-
wise provided for by local, special, or private acts; but
on the contrary, the Constitution (section 239) provides
that the Legislature shall by general laws of uniform
operation provide reasonable regulations for construct-
ing and maintaining telegraph and telephone lines with-
in the state, and for connecting the same with other
lines; and it is not reasonable to suppose that the Leg-
islature intended this section to apply only to the rural
districts in the face of this constitutional declaration.
The majority opinion holds that the ordinance in ques-
tion, and the franchise granted by it, were subject to
repeal and revocation, and that with the repeal and rev-
ocation went all the rights and property acquired there-
by. To this I cannot agree. In so far as the first ordi-
nance or franchise was a law, it could, of course, be re-
pealed, revoked, or amended by the same power and
authority which made it; but in so far as it was a con-
tract, or confirmed property rights which had become
vested, the repeal or revocation could not impair the ob-
ligation of the contract. So far as a statute creating a
corporation creates the abstract person, it is a mere law
and may be repealed; but, so far as it bestows property
and rights, it is a grant of such property, and cannot be
revoked or destroyed by subsequent statutes.—*State v.
Heyward*, 3 Rich. (S. C.) 289, 411; *Fletcher v. Peck*,
6 Cranch, 87, 3 L. Ed. 162; *Trustees of Dartmouth Col-
lege v. Woodward*, 4 Wheat. 519, 680, 691, 4 L. Ed. 629.
It is a matter of common legal learning that most of the
states in the Union have, by their Constitutions, reserv-
ed the right and power to alter, amend, or repeal the
charters of corporations, and many states have likewise
provided that all grants of powers, franchises, and priv-
ileges shall forever be subject to revocation, alteration,
and amendment. These provisions are by no means sin-

gular to our Constitution. Those states which have no such constitutional provisions usually insert similar provisions in the charters granted by them. So then "reserved powers" are common in one form or another to all the states. The language expressing the reservations is, of course, not the same in all the states; nor can it be said that they all go to the same extent, nor that they are the same in kind and degree. It is also a matter of common knowledge that these provisions in the state laws were the natural result of the decision of the famous *Dartmouth College Case,* and that they were suggested by Justice Story in his opinion in that case as a mode or means of avoiding the results which followed, and would follow, the decision in that case.

But it was never supposed and has never been contended that such reserved powers, no matter where inserted in the Constitution, in the charter, nor in what language expressed, authorized the state, the Legislature, or a municipality to ignore or avoid other constitutional questions, such as due process of law, the obligation of contracts, ex post facto laws, etc. It has been uniformly decided that such reserved powers go hand in hand with other rights and privileges secured and granted by the Constitution. In other words, it was never supposed that these reserved powers authorized the sovereign state to deny and disregard in any way the inalienable rights secured to the citizen by the Bills of Rights. It has been uniformly decided, so far as I am advised, by all courts, that alterations or repeals will never be allowed, no matter what the reserved power may be, that will disturb vested rights or operate in confiscation of property, or that will impair the obligation of contracts, or that would defeat or substantially impair a prior or original contract or grant of corporeal property, or that would deprive a corporation of its property, or

otherwise deny constitutional rights secured to corporations or to citizens.—1 Thompson on Corp. § 341 et seq. A reservation of power to violate a contract, or to alter it without the consent of all the parties, or to impair its obligations, would be as Marshall, C. J., and Johnson, J., and Chase, J., and Field, J., have aptly said, supra, not only repugnant to the Constitution itself but fundamentally wrong and repugnant to all civil government. Alexander Hamilton well said in his report to Congress on the public credit in 1795 that: "When a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent with the same rights and obligations as an individual. Its promises may be justly considered out of its power to legislate, unless in aid of them. It is in theory impossible to reconcile the two ideas of a promise which obliges with a power to make a law which can vary the effect of it. When even a real sovereign, the United States, or a state, enters into a contract with an individual or a corporation, it for the time and occasion lays aside its sovereignty and governmental functions and puts itself upon an equality with its contractor. It cannot thereafter as to that contract release itself and hold the other party to the contract. As was well said by Justice Field, it could not then change its obligations and hold its rights. It cannot bind itself as a civil corporation, and loose itself by its sovereign legislative power. * * * There have been much discussion and great differences of opinion on many points as to the meaning and effect of a similar reservation in statutes of the states, but on the point that it does not authorize any interference with vested rights all the authorities concur. Such was the language of Chief

Justice Shaw in the case cited from the Supreme Court of Massachusetts; and such is the language of Mr. Justice Clifford in the cases cited from this court. And such must be the case, or there would be no safety in dealing with the government where such a clause is inserted in its legislation. It could undo at pleasure everything done under its authority, and despoil of their property those who had trusted to its faith.—*Commonwealth v. Essex Company*, 13 Gray (Mass.) 239; *Miller v. State*, 15 Wall. 478 [21 L. Ed. 98]; *Holyoke Company v. Lyman*, 15 Wall. 500 [21 L. Ed. 133]. See, also, *Shields v. Ohio*, 95 U. S. 319 [24 L. Ed. 357], and *Sage v. Dillard*, 15 B. Mon. (Ky.) 349.  *  *  *  The same thing we repeated, with greater distinctness, in *Railroad Company v. Maine*, where we said that by the reservation the state retained the power to alter the act incorporating the company in all particulars constituting the grant to it of corporate rights, privileges and immunities, and that 'the existence of the corporation, and its franchises and immunities, derived directly from the state, were thus kept under control.' But we added that 'rights and interests acquired by the company, not constituting a part of the contract of incorporation, stand upon a different footing.' " No less eminent and authoritative law-writers than Chief Justice Shaw of Massachusetts and Judge Cooley of Michigan, in speaking on the same subject of reserved powers, have said: In *Commonwealth v. Essex Company*, 13 Gray (Mass.) 239, Justice Shaw said: "When, under power in a charter, rights have been acquired and become vested, no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted."—*Albany R. R. Co. v. Brownell*, 24 N. Y. 345. The case of *City of Detroit v. Detroit & F. Plank Road Company*, 43

Mich. 148, 5 N. W. 275, is not only in point, but entitled to high consideration on account of the distinction as a constitutional lawyer of the learned judge who wrote the opinion of the court.  The question was whether the Legislature had power to compel the defendant to remove its toll gates from within the city limits after they had been lawfully placed there under the provisions of its charter.  Judge Cooley says: "It cannot be necessary at this day to enter upon a discussion in denial of the right of the government to take from either individuals or corporations any property which they may rightfully have acquired.  In the most arbitrary times such an act was recognized as pure tyranny, and it has been forbidden in England ever since Magna Charta, and in this country always.  It is immaterial in what way the property was lawfully acquired, whether by labor in the ordinary avocations of life, by gift, or descent, or by making a profitable use of a franchise granted by the state, it is enough that it has become private property, and it is thus protected by the 'law of the land.' "

My Brothers have evidently failed to observe the distinction which the law makes between franchises and charters.  A charter is a mere receptacle of the corporation's franchise, and is not the franchise itself.  The charter is the evidence that a franchise has been granted, and is usually the only evidence of the grant.  The constitutional inhibition against impairing the obligation of contracts is not operative upon the charter, but upon the franchises which the charter contains; and it protects certain franchises because they are valuable corporeal property or contract rights.  It has been said by some courts that a municipal corporation cannot grant a franchise, but can only confer a privilege.  It would seem to be more correct to say that a franchise

can only be acquired from the state, but that it may be acquired from the state through the municipality. The court has here failed to observe the distinction between the different kinds of corporation franchises; one being the right of existing as a corporation, which is the right granted by the Legislature to a body of men to act as an artificial person without incurring individual liabilities, and the other the right to construct, operate, and maintain a corporation. One is the right to be a corporation, and the other is the right to carry it on. The latter right cannot exist until the former is vested in the corporators. As applied to telegraph and telephone companies, the first is the right vested in the corporators to be a corporation, and the second is the right vested in the corporation to carry on and operate the business of telegraph and telephone companies. The one is a right conferred upon individuals, while the other is a right conferred upon a corporation. Because a corporation enjoys franchises, such rights do not constitute a part of the essential franchise right to be a corporation. Such may be additional rights, conferred by grants upon the corporation, and not parts of the corporation itself.—*Sou. Co. v. Orton* (C. C.) 32 Fed. 457, 473.

The grant of a public franchise to a public service corporation is a contract between the state and the private corporation, in consideration of which the latter undertakes to perform certain public duties from which it cannot release itself without the consent of the state. This grant may be made by the state through its agent, a municipal corporation. The right of municipalities to govern or control the location and operation of such public service corporations depends upon the constitutional and statutory provisions governing the respective localities in which the business is carried on. A cor-

poration cannot absolutely nor conditionally alienate or assign its franchise of being a corporation; but it can alienate or assign its franchises which are in the nature of property, even though it acquire the same from the state. The state, however, usually authorizes the corporation to alienate its franchise; or it may subsequently ratify an unauthorized alienation.—*Thomas v: Railroad Co.*, 101 U. S. 71, 25 L. Ed. 950. One of the franchise rights which a telegraph and telephone company acquires from the state, or from it through a municipality, is a right of way. This is a right of easement in the land itself on which the poles and other appliances are erected, and to some extent in that over which the wires are strung. Sometimes such right is acquired by purchase, sometimes through grant, and sometimes by exercise of the right of eminent domain. It may be acquired by grant from the federal government, or by state or municipal grant, or by contract, or deed from the owner of the land, or from a railroad company. A grant from the federal, state, or municipal government of a right of way to such companies is an easement or privilege conferred upon the corporation for a valuable consideration, and cannot be taken away by a subsequent law. Most of the states have granted by statute the rights to such companies to use railroads and other highways for telephone and telegraph purposes, and in all of these statutes is conferred the right to occupy "public highways" of the state. The quoted phrase has been held to embrace city streets, unless a different intent is clearly indicated; and, so far as I have been able to ascertain, this decision is the only one holding that the phrase "public highways," as used in these statutes, does not include streets.—*Mich. Tel. Co. v. City of Benton Harbor*, 121 Mich. 512, 80 N. W. 386, 47 L. R. A. 104; *N. W. Tel. Co. v. Minneapolis*, 81 Minn. 140, 83

N. W. 527, 86 N. W. 69, 53 L. R. A. 175; *City of Duluth v. Duluth Tel. Co.*, 84 Minn. 486, 87 N. W. 1127; *East Tenn. Tel. Co. v. Russellville*, 106 Ky. 667, 51 S. W. 38, 21 Ky. Law Rep. 305; *Chamberlain v. Iowa Tel. Co.*, 119 Iowa, 619, 93 N. W. 596; *State v. Elwood*, 11 Wis. 23; *State v. Sheboygan*, 111 Wis. 23, 86 N. W. 657; *Abbott v. Duluth* (C. C.) 104 Fed. 833. Nothwithstanding that the federal government and each state has granted to telephone and telegraph companies the right to occupy post roads, public roads, and streets, and other highways, the laws usually provide that each municipality in or through which they operate their business may fix the terms and conditions upon which its own streets may be used. Such companies are required by Constitution or statute to comply with the municipal or other local laws in constructing, maintaining, or operating such lines; but this is not always the case. As I understand the authorities, whether of adjudged cases or of the text-books, they all hold that an ordinance like the one in question is a contract within the protection of both the federal and state Constitutions, and it is so treated, notwithstanding the ordinance of a municipality and of a state that has the same, or similar provisions to those of section 22 of our own Bill of Rights. Mr. Jones, in his work on Telegraph and Telephone Companies (section 90), states the law as follows: "A municipal ordinance which grants to a company authority to construct and maintain telephone lines on the streets of a city, without any limitation as to time, and for a consideration therein named, is, when accepted and acted upon by the grantee, a contract with the city which cannot thereafter be abolished or altered in its essential terms without the consent of the grantee. The franchise or right to use the streets is an irrevocable contract, and cannot be revoked without just cause,

and one which the city cannot by indirection or otherwise arbitrarily declare forfeited; nor can it remove the company's lines arbitrarily and without notice, upon the expiration of the right by lapse of the stipulated period. When the company's stipulated time has expired for the use of the streets, it has no right to continue the said use without the consent of the city, and should it attempt so to do, the city may enjoin it from further use."

In support of the above proposition, Mr. Jones cites many authorities, and all that I have examined support the text. Mr. Thompson states the rule as follows: "Municipal ordinances under certain conditions stand upon the same footing as charters as to their contractual relation. When they grant franchises on stated conditions, which are accepted, such grant then constitutes a contract between the municipality and the corporation, and the corporation is entitled to protection against subsequent legislation which would impair its obligation. Contracts which are made by municipal ordinances, under authority conferred by the Legislature, are protected against laws impairing their obligation." —Thompson on Corp. § 328. To this text the author cites a great number of adjudged cases, among them those of the Supreme Court of the United States and of this court. A municipal ordinance granting a particular telegraph or telephone company authority to construct and maintain lines on its streets without limitation as to time, and for a consideration stipulated, when accepted and acted on by such company by compliance with all the conditions imposed, and having constructed valuable plants in pursuance of such authority granted, thereby acquires the features of a contract which the city cannot thereafter abolish or alter in any essential manner without the consent of the said company.—N.

*O. v. G. S. Tel. Co.*, 40 La. Ann. 41, 3 South. 533, 8 Am. St. Rep. 502; *Brooklyn Cent. R. Co. v. Brooklyn City R. Co.*, 32 Barb. (N. Y.) 358.

It was also held in the case of *Jersey City*, 49 N. J. Law, 303, 18 Atl. 123, 60 Am. Rep. 619, that a municipality could not revoke a former ordinance or resolution, which authorized the use of streets by telephone companies, when they had conformed to the conditions of the first ordinance, and had expended money in placing poles upon designated streets; that, while it was competent for the municipality to couple with the permission to so use the streets, such reasonable conditions as the occupancy of public streets would suggest, and that while the erection and maintenance of the appliances of the business would be subject to the reasonable control of the municipal by-laws, the council could not at its mere will annul the former act which legalize the occupation of the streets and declare the property of the company so used to be a nuisance; thus destroying the property and business of the company. It has been held that ordinances conferring easements in streets, though in excess of the power of the municipality or of the Legislature, were not necessarily void in toto, but might be valid in part, as, where the ordinance conferred an exclusive right when the municipality had no power to grant such exclusive right, the ordinance was held valid in so far as it conveyed a right which was subjected to the right of the city to grant like privileges in the same streets to others.—*Morristown v. East Tenn. Co.*, 115 Fed. 304, 53 C. C. A. 132; *Birmingham Co. v. Birmingham Co.*, 79 Ala. 465, 58 Am. Rep. 615; *Weller v. Gadsden*, 141 Ala. 658, 37 South. 682, 3 Ann. Cas. 981. This identical ordinance under consideration was held by this court not to be exclusive or void, and that it allowed other like corporations to use the same streets for like

purposes.—*Am. Tel. & Tel. Co. v. Morgan County Tel. Co.*, 138 Ala. 597, 36 South. 178, 100 Am. St. Rep. 53.

It was said by this court in the case of *Port of Mobile v. L. & N. R. Co.*, 84 Ala. 119, 4 South. 106, Am. St. Rep. 342, that the Legislature under the general police power inherent in the state had a constitutional power to grant the right to construct a public utility through the streets of a city, and that, after such permission had been granted and the public utility constructed, it did not lie in the mouth of any one to complain that the changed use of the street would per se be a nuisance, and that the grant of such a privilege is obviously a franchise of the most valuable kind, and that it is certainly a "right, privilege, or franchise" within the meaning of the company's charter, and, when it is accepted and exercised by the corporation to which it is granted, it becomes a contract between the state and such corporation, and as such has always been protected from destruction by legislative action by virtue of both the federal and state Constitutions, each of which prohibits the passage of any law by which the obligation of existing contracts is impaired or arrested; that such a privilege is none the less a franchise when accepted and exercised because it was not granted directly by legislative enactment, but by municipal authority under the sanction of the charter of the corporation, which itself is a legislative enactment. What was said in that case with regard to the right of a railroad company is equally applicable and true in this case as to the right of a telephone and telegraph company. The telephone company in this case having acquired valuable property and contract rights by virtue of the legislative and municipal grants conferred upon it, and having accepted such grants and having erected its poles and wires, and engaged in the business which it was authorized by the

Legislature to carry on, and, as appears from this bill, it was carrying on in strict accordance with the requirements of the law, it thereby acquired vested rights which could not be arbitrarily destroyed by a city ordinance.

What was said by the Supreme Court of New York in the famous case of *People v. O'Brien,* 111 N. Y. 1, 40, 41, 18 N. E. 692, 698, 699 (2 L. R. A. 255, 7 Am. St. Rep. 684), is strikingly appropriate here: "When we consider the generality with which investments have been made in securities based upon corporate franchises throughout the whole country, the numerous laws adopted in the several states providing for their security and enjoyment, and the extent of litigation conducted in the various courts, state and federal, in which they have been upheld and enforced, there is no question but that, in the view of Legislatures, courts, and the public at large, certain corporate franchises have been uniformly regarded as indestructible by legislative authority, and as constituting property in the highest sense of the term. It is, however, earnestly contended for the state that such a franchise is a mere license or privilege enjoyable during the life of the grantee only, and revocable at the will of the state. We believe this proposition to be not only repugnant to justice and reason, but contrary to the uniform course of authority in this country. The laws of this state have made such interests taxable, inheritable, alienable, subject to levy and sale under execution, to condemnation under the exercise of the right of eminent domain, and invested them with the attributes of property generally." The franchise sought to be protected by this bill was acquired by this complainant after it legally became a corporation, and the title and right thereto was in all things legally acquired by it, and was in all things con-

ducted in the manner, and used for the purposes, which
the law at the time it was so acquired directed.   The
franchise was in part a grant of corporeal property, and
was therefore property undoubtedly beyond the reach
of any exercise by the Legislature or the municipality
of any reserved power contained in the Constitution,
the charter, or the ordinance.   The franchise having
been acquired by contract cannot be taken away or de-
stroyed, except by due process of law, without impair-
ing the obligation of the contract, in violation of the
identical section of the Constitution which the court, in
this case, holds authorizes its destruction.   Such a de-
struction of this franchise and of the property sought
to be prevented by this bill is likewise in violation of
article 1, § 10, and of the fourteenth amendment to the
federal Constitution.—*Sinking Fund Cases*, 99 U. S.
700-720, 25 L. Ed. 496; *Fletcher v. Peck*, 6 Cranch, 87,
3 L. Ed. 162; *People v. O'Brien*, 111 N. Y. 1-56, 18 N.
E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684.   Municipal
corporations both possess and exercise two kinds of
functions and powers, one governmental and the other
proprietary or business.   The one is for the purpose of
governing the inhabitants of municipalities, and the
other for making contracts for the benefit of the munic-
ipality and its inhabitants.   The one is a part of the
sovereign power of the state, delegated by the Legisla-
ture.   The other is for the most part, though not exclu-
sively nor necessarily, inherent, incidental and im-
plied power.—*Bessemer City v. Bessemer Waterworks*,
152 Ala. 391, 44 South. 663; *Greenville City v. Green-
ville Waterworks*, 125 Ala. 625, 27 South. 764; *Weller
v. Gadsden*, 141 Ala. 642, 37 South. 682, 3 Ann. Cas.
981; 1 Dill. Mun. Corps. §§ 26, 27, 66.   In the exercise
of the powers of the one class, municipalities are gov-
erned by those sovereign.   In the exercise of the other

they are controlled by the rules and laws which govern business corporations and individuals in acting and contracting for the benefit of themselves.—*Gregsten v. Chicago*, 145 Ill. 451, 34 N. E. 426, 36 Am. St. Rep. 496; *Illinois Trust & Savings Co. v. City of Arkansas City*, 76 Fed. 282, 22 C. C. A. 171, 34 L. R. A. 518. In the exercise of governmental powers and functions, a municipal corporation is bound, prohibited, and inhibited by the same constitutional provisions or Bill of Rights that the state or Legislature is bound by, because to this extent and purpose it is a part of the state. But in the exercise of its proprietary and business powers, and in the discharge of such functions, it is bound, prohibited, inhibited, authorized, and restrained by the same constitutional and statutory provisions which apply to other business corporations and individuals in the conduct of their private affairs. This court has uniformly held, until the decision in this case, that contracts entered into by and between municipal corporations and public service corporations, by which the former authorizes, permits, or allows the latter to occupy and use the streets or other highways of the municipality for the purpose of constructing and maintaining a system of waterworks, streets cars, etc., for the purpose of supplying the city and its inhabitants with water, or serving the people as common carriers, whether of passengers, freight, or intelligence, although in the form of and called ordinances, were in the exercise of the administrative, proprietary, or business powers of the municipality, rather than the sovereign governing or lawmaking powers and rights. Such I understand to be the holding of most all courts of this country, whether English, federal, or state; and it is certainly the doctrine announced by most of the text-writers on the subject of municipal and private corporations. The deci-

sion in this case is one among the very few that holds to the contrary.—*Greenville Waterworks Case,* 125 Ala. 625, 27 South. 764; *Ill. Co. v. Arkansas City,* 76 Fed. 271, 22 C. C. A. 171, 34 L. R. A. 518; *Weller's Case,* 141 Ala. 658, 37 South. 682, 3 Ann. Cas. 981; *Bessemer Waterworks Case,* 152 Ala. 406, 44 South. 663. If contracts in the form of ordinances as to waterworks are in the exercise of the administrative or business powers, then certainly the contract in question, as to constructing telegraph and telephone lines, should fall within the same class of powers and rights, and so do the authorities place them.

The majority also fall into error in holding that the first ordinance was an exercise of legislative or governmental powers of a municipality, other than the proprietary, private, contractual, or business powers. This question has, if not uniformly, by a great weight of authority, been decided to the contrary. This court is among the number, and therefore by implication overrules its former decisions along this line. While so far as I know this court has not held that an ordinance authorizing the use of its streets by telegraph and telephone companies was the exercise of its private or proprietary rights and powers, yet they have held that an ordinance granting the right to use the streets for waterworks and for railways was the exercise of private, proprietary, or business power, and not governmental. Surely there is no difference in principle in authorizing and in contracting with public service corporations to use the streets in consideration of furnishing the citizens with the means of acquiring and transmitting intelligence than in transportation of freight or passengers, or furnishing water or gas, etc., to the citizens. In the case of *Mobile v. L. & N. R. R. Co.,* 84 Ala. 119, 4 South. 106. 5 Am. St. Rep. 342, it was held

that a statute which authorized the use of the streets by a particular railroad was a contract within the meaning of the Constitution, and there are scores of others to the same effect. From the report of the *Weller Case,* 141 Ala. 642, 37 South. 682, 3 Ann. Cas. 981, it appears that the city had passed an ordinance granting a franchise to use the streets for the purpose of supplying water, and TYSON, J., said of it as follows: "The contract which the parties executed, although in the form of and called an ordinance, was entered into by the city in the exercise of its administrative or business powers, rather than under its governing or purely lawmaking authority. It was therefore, even if executory, not repealable, like a mere act of legislation or an ordinance, pure and simple, at the will of the enacting power.   *   *   *   A valid contract entered into by a municipal corporation may no more be repudiated, without just cause, than the contract of a private corporation or individual."

It is true, as Brother SIMPSON says in the majority opinion, the other members did not concur in nor dissent from all that was said by the writer of the opinion; but the same doctrine had been decided by this court in the case of *Greenville Waterworks Co.,* 125 Ala. 625, 27 South. 764, and was subsequently announced by DENSON, J., in the case of *Bessemer v. Bessemer Water Works,* 152 Ala. 406, 44 South. 663, in a case construing a similar ordinance, which was concurred in by all the justices who participated in the decision. In that case the court spoke as follows: "Our own court has held that a city in making a contract for water to be supplied to itself and its inhabitants is not in the exercise of its governmental, but of its proprietary or business, powers, and is governed by the rules applicable to business corporations; the purpose in making

the contract being, not to govern its inhabitants, but to obtain a public benefit for the city itself and its inhabitants." To this proposition he cites a number of cases, including that of *Weller v. Gadsden, supra.* As to the proposition announced by the court, that the telegraph and telephone company had no contract with the state or with the city that was supported by a consideration sufficient to bring it within the protection of constituitonal guaranties against impairment of the obligation of contracts, but that it was a mere permit or license, revocable at will, I submit that there is not to be found an authority to uphold it.   On the other hand, I submit that the authorities are uniform and conclusive that all agreements or grants of the kind described in this bill, between the state or a municipality and a public service corporation, for the use of the highways for the public purposes to which such corporation is authorized, and proposes, to put them, is a contract for some purposes, and within the protection of the Constitution, though it contains the general reserved powers as to repeal and revocation of both charters and franchises.   In so far as such statutes or ordinances are laws, they are revocable or repealable; but in so far as they are executed contracts, or grants of corporate property, or of property, or of property rights such as easements in land, they are not repealable or revocable in the very nature of things.   Any attempt on the part of a subsequent statute or ordinance to amend such executed contract or grant, and destroy the property acquired by virtue of it, is, of course, unavailing in law; and the state or municipality cannot legally execute or carry out such unwarranted statute or ordinance.   If it does carry it out, it is force, aggression, and encroachment, by the government, upon the rights and

property of the citizen which the Bills of Rights both state and federal are intended to guard against.

As to there being no consideration to support the grant of the charter or franchise by the state or the municipality, the contract in such cases is one of the examples which the law books afford that needs no independent consideration, not even Blackstone's common-law pepper-corn. The making or confirming of the gift, or right by the sovereign, and the acceptance of the same by the public service corporation, whereby it agrees to serve the public and to discharge a part of the duties of the sovereign, is the consideration the law contemplates. The corporation may, and sometimes does, pay large sums, in addition, for these rights, and the sovereign may, of course, demand as a prerequisite, if it will; but it is not at all necessary. And after the grant is made the courts cannot inquire into the consideration therefor. This is not the function or office of courts in such cases. This court has spoken on this subject in unmistakable language: "Every corporation is invested with privileges which distinguish it from natural persons, and do not pertain to the people generally. The perpetuity, right of succession, and of suing and being sued in a corporate name, and of exemptions from liability on the part of the corporators to its debts beyond their stock, are privileges characterizing almost all corporations. A still higher privilege is that conferred upon all companies organized for public service to build roads, etc., of subjecting private property to their use upon making compensation. The conferring of none of these or the like privileges has ever been supposed to involve an infringement of the constitutional provisions as to exclusive privileges. If it did, every act of incorporation ever granted in the state would be void. The theory of every corporation is that the

privileges are conferred upon them in consideration of public benefit which will result from their operations. The production of such benefit constitutes the public service for which the Constitution permits the grant of peculiar privileges. It is said in Blackstone's Commentaries, 467: 'It has been found necessary, when it is for the advantage of the public to have any peculiar rights kept on foot and continued, to constitute artificial persons who may maintain a perpetual succession, and enjoy a kind of legal immortality.' The public benefit is deemed a sufficient consideration of a grant of corporate privileges."—Angel & Ames on Corporations, § 13; *Daughdrill's Case*, 31 Ala. 97, 98. Charters for banks, insurance companies, railroads, and many other corporations for commercial and manufacturing purposes, although conferring privileges not enjoyed by the citizens generally, have been pronounced constitutional because of the public services which such corporations are supposed to perform. The services are the increased facilities to commerce, the employment given to labor, and the increase of public wealth, consequent upon the creation of such chartered companies. This principle may be stated in another form. Private charters are contracts in the strict sense of that term. On the part of the corporators the obligations tendered, to employ technical language, are expressed in the words, "facio ut des." The legislative assent is, "do ut facias." This, being a concurrence of two minds, aggregatio mentium, constitutes a contract. The public services afterwards to be performed by the corporation are the executory consideration. The charter granted by the Legislature is the executed price of that executory consideration. Being a contract upon a consideration "deemed valuable in the law," it follows that the courts of the country are clothed with no power to inquire

into the adequacy of the consideration. Such contracts can only be annulled and rescinded by the consent of the parties, by failure by the corporation to perform some condition of the contract, precedent or subsequent, or for fraud, perhaps, in procuring the charter. The courts cannot pronounce on the adequacy of the consideration, or whether the public will be benefited by the services to be performed by the corporation.—*Sadler v. Langham*, 34 Ala. 311, and *Moore v. Wright & Rice*, 34 Ala. 324.

The third ordinance of which this bill chiefly complains is wholly judicial action, and not legislative. It reads more like a final judgment or decree of a court of chancery, declaring the telegraph and telephone company and business a nuisance, and directing its abatement and destruction, than it does like a legislative act or a municipal ordinance. It undertakes to determine what the law and the facts were, as well as what the rights of the parties were, with reference to transactions already had and past between them. It does not attempt to prescribe what the law shall be in the future. It is, in short, a judicial foreclosure of the respondent's rights to its property, contracts, and business in the town of New Decatur. This is clearly an act of usurpation of judicial power, such as the Constitution prohibits even the Legislature from exercising. The majority opinion does not inform us when, where, or how the town of New Decatur acquired the right or power to decree the property of the telegraph and telephone company a nuisance, and destroy it without any judicial proceeding. This court has uniformly (heretofore) held that a municipal corporation cannot at pleasure, by its mere ipse dixit, declare to be a nuisance any thing or business which is not in fact or in law such.—*Town of Cuba v. Mississippi Oil Company*, 150 Ala. 259, 43

South. 706, 10 L. R. A. (N. S.) 310. In the case of
*Yates v. Milwaukee,* 10 Wall. 497, 19 L. Ed. 984, the
Supreme Court of the United States spoke as follows
upon this subject: "It is a doctrine not to be tolerated
in this country that a municipal corporation, without
any general laws either of the city or of the state, with-
in which a given structure can be shown to be a nui-
sance, can, by the mere declaration that it is one, sub-
ject it to removal." I submit that neither the laws of
this state nor those of the United States consider tel-
egraph or telephone poles and wires, occupying a street
or a highway, a nuisance; but, on the contrary, I in-
sist they treat and declare them, when properly erect-
ed and maintained, a public necessity, a vehicle of in-
telligence. Our Constitution and statutes, as well as
the federal ones, so treat and declare them.

Probably the earliest declaration of the Legislature
of this state with regard to the right of telegraph com-
panies to use the highways of the state was that of De-
cember 17, 1855 (Acts 1855-56, p. 6), which, among oth-
er things, provided that a right of way was granted to
any person having the right to construct telegraph lines
within this state upon the margin of any public high-
way. This part of the act first appeared in code form
as section 1364 of the Revised Code of 1867, and has
reappeared in all subsequent Codes, and now appears as
section 5817 of the Code of 1907, without any charge,
except to add "telephones," where it is practically the
same as when it appeared in the Revised Code, with the
addition that the right is extended to corporations as
well as persons and to telephone as well as telegraph
lines. A great number of other acts have been passed
by the Legislature relative to the rights of telegraph
and telephone companies to do business in this state,
both as to domestic and foreign corporations. The right

of eminent domain has been extended to them, as well as to the railroads and other public service corporations. This court in the case of *M. & O. R. R. Co. v. Postal Tel. Co.*, 120 Ala. 31, 24 South. 408, decided that it was matter of common knowledge that public telegraph and telephone lines are a public improvement, and that they have the right to condemn the right of way of railroads. Justice Brewer of the Supreme Court of the United States, in the case of *Pensacola Tel. Co. v. Western Union Co.*, 96 U. S. 1, 24 L. Ed. 708, said: "The electric telegraph marks an epoch in the progress of time. In a little more than a quarter of a century it has changed the habits of business, and become one of the necessities of commerce. It is indispensable as a means of intercommunication, but especially is it so in commercial transactions. The statistics of the business before the recent reduction in rates show that more than 80 per cent. of all the messages sent by telegraph related to commerce. Goods are sold and money is paid upon telegraphic orders. Contracts are made by telegraphic correspondence, cargoes secured, and the movement of ships directed. The telegraphic announcement of the markets abroad regulates prices at home, and a prudent merchant rarely enters upon an important transaction without using the telegraph freely to secure information. It is not only important to the people, but to the government. By means of it the heads of the departments in Washington are kept in close communication with all their various agencies at home and abroad, and can know at almost any hour, by inquiry, what is transpiring anywhere that affects the interest they have in charge. Under such circumstances, it cannot be for a moment doubted that this powerful agency of commerce and intercommunication comes within the controlling power of Congress, cer-

tainly as against hostile state legislation." The tele-graph and telephone systems are certainly instruments of commerce; and hence a telegraph or telephone company doing an interstate business, as this bill alleges the complainant is doing, is engaged in interstate commerce, and is within the constitutional jurisdiction of Congress to regulate, and Congress has regulated it; hence the state itself, much less a municipality, cannot arbitrarily destroy this complainant's property and business as is attempted to be done in this case. The federal Constitution protects it from any such wrongful and arbitrary invasion of its rights.

Mr. Joyce, in his recent work on Electrical Law, I think has stated the law accurately and succinctly upon this subject. He says: "The Post Roads Act confers a right and not a mere privilege to construct, maintain, and operate telegraph lines in the manner provided, and upon, over, and along the places specified. A plenary power is granted for the benefit of the public and of the government of the United States, having in view the growing necessities of commerce and the needs of the postal service; but, while the statute confers this right, it may not be exercised absolutely and under all circumstances. It cannot, as will hereafter appear, be taken away by hostile state legislation, nor can such legislation operate to prevent placing telegraph lines upon, over, along, or under the places designated in said Post Roads Act. Nor after such lines are located there may the use of them be stopped by state or municipal legislation," etc. Section 62. * * * The telegraph is indispensable as a means of interstate communication. This power to regulate interstate commerce and to establish post offices and post roads is exclusive of hostile legislation, and this is true as to the power to regulate telegraph companies in respect to

interstate business, for the state can impose no regula-
tions or restrictions upon, or impediments to, the free-
dom of that business.   Nor may municipal authorities
require the removal of telegraph lines established upon
the post or military roads of the United States," etc.
Section 65   *   *   *   Telegraph companies engaged in
interstate commerce, and exercising federal agencies
under the grant or privileges conferred by the Post
Roads Act, are subject to the operation of the laws of
the state, and of the rules, regulations, and the exer-
cise of police power of the governmental locality where-
in they are located or carry on their business.   But
when those laws, rules, and regulations, or the unlaw-
ful exercise of police power incapacitates or unreason-
ably impedes such companies in the rightful legal ex-
ercise of their federal privileges or duties, and tran-
scend the powers which the state or local government
posses over its purely domestic affairs, whether of police
or internal commerce, then the national jurisdiction is
invaded."   Section 67.   All public roads and high-
ways while kept up and maintained as such are post
routes.—Rev. St. 3964 (U. S. Comp. St. 1901, p. 2707) ;
Act March 1, 1884, c. 9, 23 Stat. 3.   It has, however,
been decided by the Supreme Court of the United Sttaes
that these federal statutes no more carry with them any
unrestricted right to appropriate public property than
the right to appropriate private property.   Like all
other franchises, it is to be exercised in subordination
to public rights, as well as to private ones.   The fran-
chise right, of course, must be exercised, and the right
of way obtained, in accordance with the reasonable
police regulations of the state and of the municipality;
but, when so obtained, neither can arbitrarily destroy
the property or the business of the telegraph or tele-
phone company.—*St. Louis v. Western Union Tel. Co.,*

148 U. S. 100, 13 Sup. Ct. 485, 37 L. Ed. 380; *Western Union Tel. Co. v. Attorney General*, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790. The true doctrine is clearly expressed by Justice Brewer in the case of *Le Loup v. Mobile*, 127 U. S. 645, 8 Sup. Ct. 1382, 32 L. Ed. 311, carried up from this state. He says: "We have decided that communication by telegraph is commerce, as well as in the nature of postal service, and if carried on between the states, it is commerce among the several states, and directly within the power of regulation conferred upon Congress and free from the control of state regulations, except such as are of a strictly police character."

This being the undoubted law, it followed that the acts complained of in this bill were clearly void, because in violation of the federal laws. The object and end of legislative power, under our republican and constitutional form of government, necessarily places certain limits and restrictions upon the exercise of that power. It is not omnipotent power, by any means, which is thus conferred upon the lawmaking body. This results from the very nature of the government itself. There are certain things which neither the federal nor the state Legislature can do, without exceeding its authority. There are underlying our form of government certain necessary, vital, and basic principles intended to prevent the abuse of powers thus conferred upon the legislative departments. They cannot authorize a manifest injustice by a legislative enactment which takes away or disregards the security of personal liberty, of life, and of property, for the conservation of which the very government itself was established. If a municipality by a mere ordinance can do what the town of New-Decatur professes it can do, and proposes to do, in this case, unless restrained, it would be difficult to conceive

anything which it cannot do. I do not believe it possesses any such powers or rights, and I believe that it should be restrained by the strong arm of the law. Long have we boasted that our government is one of laws and not of men; but it will certainly cease to merit longer this encomium, when it has not the will and the might to prevent or restrain the destruction of vested rights by its own agencies.

ANDERSON, J.—I join Justice MAYFIELD in the dissent from the majority holding, but wish to rest my conclusion on the one fact—that the complainant was authorized by the statute, section 2490 of the Code of 1896 [5817, Code of 1907] to erect its line along the margin of the streets of New Decatur, whether with or without the consent of the municipality. This authority being given by the Legislature, the municipality had no right to declare the poles and wires of complainant a nuisance per se or to order them removed, and in my opinion the bill contains equity. The statute says: "The right of way is granted to any person or corporation having the right to construct telegraph or telephone lines within this state to construct them along the margin of public highways." "The term 'highway,' as used in the statutes, is generally held to include streets, unless the statute itself indicates a different intention."—28 Cyc. 834, and many cases cited in note 9. I do not think that the statute in question indicates that the word "highways" should include only rural roads; for, while it appears in a chapter pertaining to public roads, the word "roads" is used in every section except this one, where the word "highways" is substituted, thus evincing a legislative intent not to confine the right to roads elsewhere dealt with in the chapter, but to extend it to all highways and to use a word that

gives the subject its broadest meaning. This identical statute was held to include streets in the case of *Southern Bell Telephone Co. v. City of Mobile* (C. C.) 162 Fed. 523, and which said case was affirmed by the Court of Appeals (174 Fed. 1020, 98 C. C. A. 663). True, this construction may not be binding on this court, but it should be very persuasive, especially when supported by nearly every court and text-writer in the country, and to my mind it should be followed, especially when a different holding involves the destruction of property and is revolutionary in results.

It may be true that the right could not now be given by the Legislature without the consent of the municipality (section 220 of the Constitution of 1901), but this constitutional restriction did not exist when this complainant's vendor first constructed its line upon the streets of New Decatur. On the other hand it may be conceded that the right was derived from the city, was contractual, and authorized by the charter of the municipality, as is indicated by the majority opinion, yet I cannot agree that the ordinance reserved the right to revoke the contract or that section 23 of the Constitution does so. To my mind, section 3 of the ordinance merely reserved the right to regulate and control the use of the streets, and did not reserve the right to revoke the grant or contract. Therefore, if the grant was authorized, as my Brothers hold, then it became a contract, and as such it has always been protected from impairment by the federal and state Constitutions, each of which prohibits the passage of any law by which the obligation of any existing contract is impaired or lessened.—*Mobile v. L. & N. R. R. Co.,* 84 Ala. 115, 4 South. 106, 5 Am. St. Rep. 342. This case dealt with a grant similar to the present one, and is an authority in point, that it is a binding contract to be protected

under the federal and state Constitutions, unless the Constitution of 1875, which did not apply to the grant then considered, applies to the present grant, which was made in 1898 and prior to the Constitution of 1901, and which said last Constitution should be discarded from the consideration of this case, as section 22 is not identical with section 23 of the Constitution of 1875, and the use of them in connection with each other, as is done in the majority opinion, can serve no good purpose and will only lead to confusion. I think that the majority misconceive the meaning of section 23 of the Constitution of 1875, and treat it as saying and meaning that the Legislature can grant neither an exclusive nor a perpetual privilege or immunity, when it neither says nor means anything of the sort. There is nothing in the grant that makes it exclusive, and the only theory upon which the majority can read section 23 into the ordinance is that it is perpetual, as no limitation is placed upon the same or no time fixed for the termination of the contract. Section 23 says: "That no ex post facto law, or any law impairing the obligation of contracts, or making any irrevocable grant of special privileges or immunities, shall be passed by the General Assembly." It does not say that irrevocable grants cannot be made of privileges not special, but prohibits only irrevocable grants of special privileges or immunities, and which means exclusive privileges or immunities, and does not prevent irrevocable grants of privileges which are not exclusive. "Special privilege," is defined in 36 Cyc. 523, to mean, when used in constitutions, as a "right, a power, franchise, immunity or privilege granted to, or vested in, a person or class of persons to the exclusion of others and in derogation of the common right." Our own court, in an able and well-considered opinion, by SOMERVILLE, J., in the case

of *Birmingham R. R. v. Birmingham & Pratt Mines R. R.*, 79 Ala. 465, 58 Am. Rep. 615, in effect, adopted the foregoing meaning of "Special privilege," and construed it as meaning exclusive privilege. Says of section 23: "What, it may be asked, is the nature of these special or exclusive privileges, which are thus prohibited to be granted by the Legislature? It seems plain from the very terms used that the evil intended to be specially prevented was the granting of exclusive privileges in the nature of a monopoly by the legislative creation of corporate franchises." The ordinance granted the complainant's grantor no exclusive use of the streets for telephone purposes and in no manner created or attempted to create a monopoly, and, as long as it did not do that, the grant could be perpetual without doing violence in the slightest to section 23 of the Constitution of 1875. It may be true that such a grant cannot extend over 30 years under the Constitution of 1901, but said last Constitution has no application to the present grant. The grant in question, though perpetual, but not exclusive, was not subject to revocation, under the terms of said section 23 which should not be read into the ordinance, as stated in the majority opinion, as said section has no application except to prohibit the irrevocable grant of "exclusive" privileges or immunities, and there is nothing exclusive in the ordinace in question. I therefore think that if the ordinance was authorized, as held by the majority, it became a binding contract which could not be impaired or revoked by the Legislature or the municipality, and that it did not fall within the influence of section 23 of the Constitution of 1875, as it was not such a grant as is thereby prohibited. So, under any aspect of the case, whether the grant was under section 5817 of the Code of 1907, or the ordinance of the respondent, one or both, it was ir-

revocable as to this respondent, and the lower court properly held that the bill contains equity. Whether the complainant occupies the streets directly under the statute or through the ordinance of the respondent or regardless of the inviolability of the grant, the city would no doubt have the right to have the poles or lines removed or put under ground, if maintained in such a way as to constitute a nuisance, but that should be done under legal process, and not upon the mere ipse dixit of the respondent.

As stated in the outset, I think the grant was under section 5817 of the Code, and not under an ordinance of the city, and the other questions could well be pretermitted, but as the majority hold that the statute does not apply and the grant is derived from the ordinance, and which was authorized, which I merely assume but do not decide, then I think that the respondent did not reserve the right to revoke, nor does section 23 of the Constitution do so for it.

ON REHEARING.

SIMPSON, J.—The ordinance involved in this case is clearly an exercise of the governmental functions of the city. It has none of the elements of a contract, but is purely a grant of the right to place poles in the streets by the governing body of the city. The company did not bind itself to do anything, but was free to enter upon the work or not, as it might choose, could not have been forced by the city to act at all, and, even after it had erected its poles, it might have removed them and ceased to do business, at any time, without a violation of any contractual obligations. As shown in the original opinion in this case, every ordinance granting special privileges must be construed as if section 23

of article 1 of the Constitution of 1875 was written into the ordinance. If the ordinance had had written into it a provision declaring it revocable, certainly no court would hold that it could not be revoked.

The Alabama cases referred to were dealing simply with the exclusive feature of the section of the Constitution, and consequently there was no necessity for discussing the right of revocation. In fact, they derived the exclusive feature from the revocability of the grant.

To construe this section of the Constitution as referring merely to monopolies, or to exclusive grants, is simply to write out of the Constitution its important word, and to write into it other words. The section in question does not mention monopolies, nor is the word "exclusive" in it. It provides merely that "no ex post facto law, or any law impairing the obligation of contracts or making any irrevocable grants of special privileges or immunities, shall be passed by the General Assembly." And, when the Constitution of 1901 was adopted (section 22), it emphasized the expression, providing, not that no irrevocable grant of exclusive privileges shall be made, but that "no irrevocable grant or exclusive grant" of special privileges shall be made, and provides that "every grant," etc., shall forever remain subject to revocation. So its prohibition is against making any irrevocable grant. In other words, the decisions are based on the reasoning that inasmuch as the Constitution has forbidden the making of any irrevocable grant, and can revoke any such grant in toto, it necessarily follows that it can revoke it in part, by granting the same franchise to another. The argument to the contrary is to say that, because the Supreme Court has declared that something not specially mentioned in the Constitution (to wit, exclusive grants) is included in its prohibition, therefore the subject which is dis-

tinctly mentioned in the Constitution (to wit, irrevocable grants) is not within the prohibition. As well say that because the court has said that increasing the punishment, or the degree of the crime, is included in the ex post facto clause of the Constitution, therefore the actual making some act previously committed a crime, which was not so before, was not intended to be prohibited by the section, or because making certain acts constitute murder is ex post facto, yet the section does not refer to any other crime. It cannot be doubted that the privilege of erecting telephone poles is a special privilege—that is, a privilege not enjoyed except by a special grant—and according to the plain words of the Constitution all such grants must remain revocable.

The following Alabama cases referred to contracts by which certain companies entered into agreements to construct and operate certain works for the benefit of the city, and the city, in turn, granted certain franchises. In *Weller et al. v. City of Gadsden, et al.*, 141 Ala. 642, 37 South. 682, 3 Ann. Cas. 981, the ordinance in question involved a contract, by which the water company agreed to furnish the city with water for fire plugs and hydrants, and to furnish water free of charge for certain public buildings and fountains, and for sprinkling the streets, in consideration of which the franchise was granted. In *City of Gadsden et al. v. Mitchell et al.*, 145 Ala. 137, 156, 40 South. 557, 558 (6 L. R. A. [N. S.] 781, 117 Am. St. Rep. 20), the same contract or ordinance was before this court, and the evidence showed that the ordinance had not been repealed, but, on the contrary, that another ordinance had been passed showing that certain modifications had been agreed upon, "and the original contract was in all things ratified and confirmed, and declared to be in full force." The party demanded of the city to do certain

things which the contract required it to do, and this
court properly held that the only question was whether
with the contract "still in force and unrepealed, said
city can refuse to carry out its provisions."—145 Ala.
page 157, 40 South. page 558, 6 L. R. A. (N. S.) 781,
117 Am. St. Rep. 20.  This court also declared that
the making of such a contract was not a delegation of
a governmental function, but an exercise of its busi-
ness or proprietary powers, but distinctly pretermitted
deciding the question whether, even as to that contract,
the city could repeal the ordinance.   In the case of
*City of Greenville v. Greenville Waterworks Co.*, 125
Ala. 625, 639, 27 South. 764, 769, the city entered into
a contract with the water company by which said com-
pany agreed to furnish the city water for fire plugs,
hydrants, etc.  Suit was brought for amounts due for
service rendered, and the city set up as a defense that
the council had no power or authority to make such a
contract.  No question of the right to repeal was raised.
The court held the contract valid, as an exercise of the
business powers of the city, but expressly pretermitted
the question as to whether that part of the ordinance
"in respect to the exclusive and continuing features of
the franchise" was ultra vires.  The case of *City of Bes-
semer v. Bessemer Waterworks*, 152 Ala.    391, 406,
44 South. 663, 667, involves a contract by the city with
the water company to furnish water for the uses of
the city and its inhabitants, and it is true that this
court held such a contract an exercise of the proprietary
or business powers of the city.   There was no attempt
to repeal the ordinance by which the contract was made.
The case of *Birmingham & Pratt Mines Street Railway
v. Birmingham Street Railway*, 79 Ala. 465, 475, 58
Am. Rep. 615, asserts the self-evident proposition that,
if the Legislature cannot make an irrevocable grant, "a

fortiori, a mere municipality would have no such power."

What has been said of this constitutional provision is absolutely decisive of this case, but, in addition, the numerous cases cited by counsel in opposition to this rehearing are at least persuasive, if not conclusive to the proposition, that any grant of such privileges, without any limit of time, must necessarily be a mere license, which is revocable.

I think the application for a rehearing should be overruled, and in this opinion DOWDELL, C. J., and McCLELLAN, J., concur, but as a majority of the court, for various reasons expressed in their several opinions, hold that the rehearing should be granted, the judgment of reversal is set aside, and a judgment of affirmance entered.

Affirmed.

ANDERSON, MAYFIELD, SAYRE, and SOMERVILLE, JJ., concur. DOWDELL, C. J., and SIMPSON and McCLELLAN, JJ. dissent.

SAYRE, J.— (concurring.)—In view of some differences among the members of the court in respect to the law of the case I prefer to state the reasons for my opinion that the decree should be affirmed.

In 1898 the town of New Decatur adopted an ordinance granting to the American Telephone & Telegraph Company, a corporation organized under the laws of the state of New York, its successors and assigns, the right to construct, operate, and maintain lines of telephone and telegraph, including the necessary poles, wires, and fixtures, upon, along, and under the highways of the town. Conditions of the grant were that all poles should be neat, straight, and symmetrical, and so located as not to interfere with the public use of

the highways, and, further, that the company should be
subject to all ordinances then in force or that might
thereafter be passed "relative to the use of the public
highways of the said town." Section 4 of the ordinance
provided that: "In consideration of the rights and
privileges herein granted, said company shall furnish
free of cost to said town space for its fire alarm and
police wires upon all poles erected under this ordi-
nance." Acting on this ordinance, the company erect-
ed lines of wires, and operated a system of telephones.
In 1902 the rights acquired under this ordinance were
transferred and assigned to an Alabama corporation
of the same name, the complainant below, appellee here.
March 14, 1904, the board of aldermen passed an ordi-
nance repealing and annulling the ordinance granting
the franchise, and on May 3d thereafter passed anoth-
er ordinance requiring appellee corporations to remove
all poles, wires, and other property from the streets,
and providing that, on a failure of the telephone com-
pany to remove its poles, wires, and other property
within 30 days, the same should be considered a nui-
sance, and the company's officers, agents, and employees
dealt with as other parties maintaining a nuisance.
Thereafter the Telephone Company filed its bill, aver-
ring, in detail, the facts above set forth, and, further,
that it had erected and equipped its telephone system
at an expense of $20,000, comprising 20 miles of poles
in 38 different streets, avenues, and alleys in said town,
its poles being set just inside the curbing so as to im-
pair in no wise materially the public convenience or
travel, and praying that the last-mentioned ordinances
be declared null and void, and the defendant munici-
pality be enjoined from interfering with its property.
The court below overruled a demurrer to the bill, and
made a similar order in response to defendant's motion

to dissolve an interlocutory injunction which had been granted. This appeal followed.

As for the meaning of that provision of the Constitution of 1875, of force at the time this franchise was granted, inhibiting laws making irrevocable grants of special privileges or immunities, that has been settled by the decisions of this court. In the case of *Birmingham Railway Companies*, 79 Ala. 465, 58 Am. Rep. 615, it was said that the evil intended to be specially prevented was the legislative granting of exclusive privileges in the nature of monopolies. The language of the opinion is: "What, it may be asked, is the nature of these special or exclusive privileges which are thus prohibited to be granted by the Legislature? It seems plain from the very terms used that the evil intended to be specially prohibited was the granting of special privileges in the nature of a monopoly by the legislative creation of corporate franchises." And on page 475 of 79 Ala. (58 Am. Rep. 615): "The policy of the law, as now declared by our Constitution, is as clear in the condemnation of the grant of irrevocable exclusive privileges conferred by franchise as that of the common law was in the reprobation of pure monopolies." The constitutional provision and the decision to which I have referred were correctly interpreted by the Supreme Court of the United States in *Bienville Water Supply Co. v. Mobile*, 186 U. S. 213, 22 Sup. Ct. 824, 46 L. Ed. 1132, where it was said, after referring to our case: "By a separate section of the Constitution, it is declared that the Legislature shall pass no act 'making an irrevocable grant of special privileges or immunities.' While that body may grant special privileges and immunities to build waterworks, construct railways, or other works of public utility, and by a failure to duplicate a grant make it in effect for the time being exclu-

sive, yet no Legislature can forestall action by a succeeding Legislature, or bind the state by making the grant in terms exclusive. As much force and effect must be give to section 23 as to any other, and it was obviously the intent that, even if exclusive privileges were granted, the monopoly feature thereof should always be subject to revocation." To that section of the Constitution of 1875, to which I have referred, there was added in the Constitution of 1901 these words: "And every grant or franchise, privilege or immunity, shall forever remain subject to revocation, alteration or amendment." This amendment was hardly intended to refer to grants of corporate charters, for to that purpose some of the language employed would be inapt, and that subject was dealt with and the right of revocation and amendment, in such manner, however, that no injustice shall be done to stockholders, was reserved in section 238 of the Constitution of 1901 under the appropriate head of corporations just as in the Constitution of 1875 a like provision was placed under a like appropriate head.    I would be slow to believe it was intended to reduce all future grants under which public utilities may be operated to the level of mere revocable licenses, dependent upon the pleasure or caprice of the granting power, and without any element of inviolable contract, thus, in effect, denying the right of the state and its subsidiary governmental agencies to contract in reference to franchises or rights to the use of the streets without which public utilities could not exist or render service. That would seem to involve a remarkable constitutional principle such as may not be found elsewhere in this country, and hardly to be expected in close context with a provision prohibiting the enactment of any law impairing the obligation of contracts. There is, however, no occasion for saying just what this amendment does in-

tend, since the franchise in question antedates the Constitution of 1901. Every grant of a franchise or right to the use of the streets or highways for the transportation of persons, commodities, or intelligence is special and in a sense exclusive, for the instrumentalities necessary in carrying on the business must occupy space which cannot at the same time be occupied by the like instrumentalities of other persons, natural or artificial, who would engage in the same business. But, so far as the public is concerned, every such grant, is justified on the theory that the surrender to some extent of the previous right to the common use of the public property in its entirety is more than compensated by the substitution of other more valuable facilities, while, so far as concerns other persons or corporations who would save the public by exercising similar franchises, such grant of rights is not exclusive so long as the power to grant other similar franchises is reserved. This right to grant like franchises to others, without regard to the terms of previous grants, was reserved and secured in every case by the provision under consideration, and it became part and parcel of every contract granting franchises under the Constitution of 1875. Beyond that the provision did not go. It did not prohibit the grant of franchises in perpetuity, nor did it reserve the right to revoke anything but the exclusive feature of franchises which might be granted in exclusive terms. The right to revoke the exclusive feature of a franchise it did, however, reserve, though the franchise may have taken the form of a contract upon valuable consideration. It has no application to the case in hand.

The language of the ordinance in this case was "that the American Telephone & Telegraph Company, its successors and assigns, be and the same is hereby granted the right, privilege and authority to construct, operate

and maintain lines of telephone," etc. This imported the grant of a right rather than mere privilege or license, nor is the right granted limited to the construction of lines for long distance service, as appellant would seem to infer. And, being without limitation as to duration, it was a grant in perpetuity, for the court cannot undertake to make a contract for the parties by assigning a term to the grant. In the *Birmingham Railways Case, supra,* the court spoke of a franchise, not limited as to duration, as a perpetuity. But as I read the decision, the franchise there was condemned, not because granted in perpetuity, but because it was exclusive. In *Wabash Railroad Co. v. Defiance,* 167 U. S. 88, 17 Sup. Ct. E48, 42 L. Ed. 87, where no particular length of time was prescribed, the court said: "The only contract as to time which could possibly be extracted from this ordinance would be that the railway company on building the bridges and approaches should be entitled to maintain them in perpetuity." Counsel on either side cite a number of other cases adopting the same rule of interpretation as to contracts framed as this was in respect to duration. There is no language in the Constitution, or in the charter of New Decatur for that matter, prohibiting the grant of indefinite or perpetual franchises. In *People v. O'Brien,* 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684, where the question was whether the franchise to maintain tracks and operate cars on Broadway, granted on a consideration other than the public good to be derived from the exercise of a franchise, survived the dissolution of the corporation, it was held, to quote the Supreme Court of the United States stating and approving the ruling in *Detroit v. Detroit Ry. Co.,* 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, "that a corporation, although created for a limited period, might acquire

title in fee to property necessary for its use; and, where the grant to a corporation of the franchise to construct and operate its road in the streets of a city is not, by its terms, limited and revocable, the grant is in fee, vesting the grantee with an interest in the street in perpetuity to the extent necessary for a street railroad." Judge · Dillon states his opinion (3 Mun. Corp. § 1265) of the New York decision as follows: "In the absence of language expressly limiting the estate or right of the company, we think the court correctly held under the legislation (making such interests taxable, inheritable, alienable, and subject to condemnation under the right of eminent domain, and vesting them with the attributes of property generally) and the facts, that the right created by the grant of the franchise was perpetual, and not for a limited term only. No other view is consistent with the long line of decisions to the effect that such rights are property rights which cannot be destroyed or impaired by legislative enactment. These decisions have been rendered upon the assumption that, when the grant has been made by legislative authority and accepted and acted on, it is beyond recall, and, except as it is subject to the exercise of the police power cannot thereafter be impaired by legislative enactment." And in a slightly different connection (section 1268) he submits "that the term of an indefinite franchise is not necessarily limited by the corporate life of the grantee, but should be determined by the legislative intent as deduced from the statute fairly construed, or the intent of the contracting parties where the franchise results from a contract, express or implied, with a municipality."

Municipal corporations, exercising a part of the sovereign power of the state by delegation, must be able to show legislative authority for the acts which they undertake to perform. A reasonable doubt will be re-

solved against the grant. "But the application of the rule must not be so stringent as to thwart the legislative intent, fairly and reasonably appearing."—*Ex parte Florence,* 78 Ala. 419. Powers necessarily implied or incidental to the purposes and objects of the corporation will be regarded as conferred. The language of *Eufaula v. McNab,* 67 Ala. 588, 42 Am. Rep. 118, is: "Municipal corporations, it is obvious, can exercise only such powers as are expressly granted in their charters, and such as may be necessary and proper in order to carry such express or direct powers into effect; but these powers include those which are indispensably necessary to the declared objects and germane to the governmental purpose for which such corporations may be organized." This court held in *Hobbs v. Long Distance Telephone Co.,* 147 Ala. 393, 41 South. 1003, 7 L. R. A. (N. S.) 87, 11 Ann. Cas. 461, that the construction of telephone and telepraph lines over public highways imposes no additional burden, but that "it is accomplishing one of the great purposes for which public roads are dedicated." I cannot doubt that the general powers of a municipal corporation by which it is invested with the control and regulations of its streets and highways for the general good are adequate to authorize the construction, of the power to delegate the right to construct telephone lines consisting of poles and wires for the transmission of intelligence. Section 7, subsec. 20, of the charter of New Decatur, gives power to regulate the use of the streets.—Acts 1888-89, p. 372. In *St. Louis v. Western Union Telegraph Co.,* 149 U. S. 465, 13 Sup. Ct. 990, 37 L. Ed. 810, the Supreme Court of the United States had to say of the power to regulate the use of the streets of the city: "It is given power to open and establish streets, to improve them as it sees fit, and to regulate their use, paying for all

this out of its own funds. The word 'regulate' is one of broad import. It is the word used in the federal Constitution to define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by Ordinance No. 11604, it simply regulates the use of them when it prescribes the conditions and terms upon which they shall be used." But, aside from any question as to the scope of its general power of regulation, the municipal corporation of the town of New Decatur seems to have had under its charter by necessary implication the power to grant franchises for the erection of poles and wires for telephone and telegraph lines. By section 7 of its charter, subsec. 23, it has power "to regulate the openings therein (in the streets) for the laying of gas or water mains and pipes and the building and repairing of sewers, culverts and drains, and erecting gas and electric lights, telegraph and telephone poles and wires."—Ib. True the power to regulate other public utilities, as ferries, street railways, wharves, waterworks, and establishments for furnishing gas and electricity for lighting and heating, are more specifically granted in other sections of the charter, and section 23 seems to be capable of the interpretation put upon it by counsel—that is, it merely authorizes the municipality to regulate openings in the streets for telegraph and telephone poles and wires—but that is a narrow construction of the language of that section, and it would be almost incredible that the Legislature, preparing a scheme of government for a municipality of this day and time, intended to leave it powerless to provide for the uses of the electric telegraph and telephone. I think the language used sufficient to exclude such in-

tention, and that the municipality had power to grant the franchise in question.

The power to control the streets, the power exercised in the grant of this franchise, is legislative, but it may be and commonly is delegated to municipal corporations, and was so delegated in this case. But the authorities everywhere recognize the presence of the contractual element in franchises of this character when accepted and acted on, no specific right of revocation being reserved. On the other hand, the police power, the power to take ample care for the morals, health, safety, and convenience of the people cannot be bartered away. "The right to use a highway or street is taken, affected with the implied condition that the highway or street shall not be used in such manner as to destroy its proper and legitimate use by the public at all times."— *Grand Trunk Railway v. South Bend,* 174 Ind. 203, 89 N. E. 885, 91 N. E. 809, where many cases are cited. The relation between inviolability of contracts and the police power in such cases was thus stated by Chief Justice Fuller: "The governmental power of self-protection cannot be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury."—*N. Y. & N. E. R. R. v. Bristol,* 151 U. S. 567, 14 Sup. Ct. 437, 38 L. Ed. 269. In the cases I have seen in which the contract rights of the grantees of franchises have been made to yield to the exercise of the police power some residuum of the original privilege has been preserved, as for example, in *Railroad Company v. Richmond,* 96 U. S. 521, 24 L. Ed. 734, where a steam railroad was required after 40 years to abandon the use of steam along a street; as in *C., B. & Q. R. R. v. Nebraska,* 170 U. S. 57, 18.

Sup. Ct. 513, 42 L. Ed. 948, where a burden of repair, in excess of that stipulated in the original grant, was imposed on the railroad company; as in *Wabash R. R. v. Defiance*, 167 U. S. 88, 17 Sup. Ct. 748, 42 L. Ed. 87, and numerous other cases of like kind, where railroad companies were required to change the grade of their tracks; as in *Baltimore v. Baltimore Trust Co.*, 166 U. S. 673, 17 Sup. Ct. 696, 41 L. Ed. 1160, where a street railroad company was restricted to the use of a single instead of a double track as originally granted; as in *People v. Ellison*, 188 N. Y. 523, 81 N. E. 447, where overhead wires were required to be removed to underground conduits; as in *People v. Squire*, 145 U. S. 175, 12 Sup. Ct. 880, 36 L. Ed. 666, where the expense of constructing the conduits and the expenses of a commission appointed to carry out the statute was imposed on the companies; and as in *Jonesville v. Telephone Company*, 155 Mich. 86, 118 N. W. 736, 130 Am. St. Rep. 562, 16 Ann. Cas. 439, where the poles and wires of public service corporation were excluded entirely from a particular street, it not appearing that the use of such street was necessary to reach persons desiring its service who would otherwise be cut off therefrom. Out of these and many other cases Judge Dillon extracts a rule as follows: "These franchises are property which cannot be destroyed or taken from the grantee or rendered useless by the arbitrary act of the municipal authorities in preventing the grantee from using the city streets for the purposes of the grant, although the municipality may seek to justify such act as an exercise of the police power. Therefore any regulations adopted by virtue of the exercise of the police power must be such as are called for by a fair consideration of the public welfare, must be reasonable in their character, and must not be such as to defeat

the purpose of the grant."—3 Mun. Corp. § 1269. Clearly the judgments in the cases to which I have referred imposed new and heavy burdens and obligations upon the grantees of the franchises involved. But the police power is paramount, and, if its integrity as an inalienable power of government is to be preserved, I cannot see why the use of the streets by public utilities, though once granted, and though the grant was proper at the time, may not be denied altogether whenever conditions are so changed by crowding populations that such extreme alternative becomes necessary to preserve for all the people those uses to which the streets were primarily dedicated. Such a rule would give protection to every right acquired in the beginning, and would prevent their impairment by arbitrary or capricious action. Such seems to be the rule recognized in the case of *Mobile v. L. & N. R. R. Co.*, 84 Ala. 115, 4 South. 106, 5 Am. St. Rep. 342, where it was said that the railroad company was possessed of an irrevocable franchise, conferred by the city ordinance, subject to the limitation only that the use of the street by the public should not be unnecessarily or materially impaired. I take this to be the meaning, also, of *St. Paul v. C., M. & S. P. R. R.*, 63 Minn. 330, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458, 34 L. R. A. 184, where it was said: "And grant of priveleges upon lands dedicated to a particular public use is necessarily subject and subordinate to the rights and necessities of the public, and may always be revoked and terminated whenever required by the needs of the public in the use of it for the purpose for which it was dedicated. This is an implied condition of every such grant, for there can be no irrevocable license as against the rights of the public to the full enjoyment of its easement in the property."

That section of the ordinance by which it was provided that the grantee should have and exercise the right or privilege granted subject to all ordinances then in force, or that might thereafter be passed relative to the use of the public highways of the town, cannot be construed as the reservation of a right in the council to revoke at pleasure. That was a reservation of the right to regulate, not to destroy.—*Detroit v. Detroit Ry. Co.,* 184 U. S. 384, 22 Sup. Ct. 410, 46 L. Ed. 592. Concluding an elaborate note in review of the authorities on the general question here involved, the editor of the Lawyer's Reports Annotated says: "The conclusion from all the authorities seems to be clear to the effect that a franchise or privilege to use streets for any of various quasi public purposes above considered will constitute an irrevocable contract, unless there is in some form a clear reservation of the right to cancel or revoke."—*Clarksburg Electric Light Co. v. Clarksburg,* 47 W. Va. 739, 35 S. E. 994, 50 L. R. A. 142.

The course of the municipality cannot be justified on the facts stated in the bill. The ordinances complained of cannot be taken as an effectual judgment of forfeiture of appellee's franchise for abuse or misuse, though it was doubtless so intended. That would require judicial proceedings. Nor were they a legitimate exercise of the police power. "The public necessity of the exercise of the police power in any case is a matter addressed to the discretion of the Legislature, but whether a given regulation is a reasonable restriction upon personal rights is a judicial question."—Tiedman on Police Power, § 214. And the presumption is in favor of the reasonableness of the ordinance condemning appellee's poles and wires as a nuisance.—*Van Hook v. Selma,* 70 Ala. 361, 45 Am. Rep. 85; *Grand Trunk Railway v. South Bend,* 174 Ind. 203, 89 N. E. 885, 91 N.

E. 809. Conceivably all the appellee's 20 miles of poles and wires on 38 different streets had become a menace to the safety of the public, and in that case the municipality would have had the right to condemn and remove them without affecting appellee's right to the proper use of its franchise. But I think it appears with reasonable certainty that the theory on which the board of aldermen proceeded takes their action without the range of legitimate power and without the saving of favorable presumption. The bill excludes the idea that appellee's lines were so constructed as to interfere with the purposes of travel and transportation to which primarily the streets were dedicated by averring, as already stated, that they were erected on the inside of the curbing so as in no wise to impair materially public convenience or travel. The ordinance of March 14, 1904, undertook to repeal the ordinance granting the franchise. Upon the heels of that another ordinance declared, not that the wires and poles were a nuisance in fact, but, in effect, that they would become a nuisance unless removed within 30 days. Nor was any other means or method by which appellee might exercise its franchise provided. The clear purposes and effect, then, of what was done, was to declare the appellee's property a nuisance for the reason that, its franchise having been annulled, appellee had no right to have its poles and wires upon the streets in any shape or place whatever. These ordinances were beyond the power of the board of aldermen, and their attempt to enforce obedience to their pronunciamento was properly enjoined.